F.T. HAVENS, Petitioner,

v.

The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF ARCHULETA, Colorado, Respondent.

No. 95SC572.

Supreme Court of Colorado,
En Banc.

Sept. 23, 1996.

---

Dugan & Associates, Thomas P. Dugan, William E. Zimsky, Durango, for Petitioner.

Larry W. Holthus, Pagosa Springs, for Respondent.

Larry W. Berkowitz, Littleton, for Amicus Curiae City of Littleton.

Holme Roberts & Owen, LLC, Patricia C. Tisdale, Erin M. Smith, Denver, for Amicus Curiae City of Lafayette and Town of Frisco.

Hall & Evans, L.L.C., Thomas J. Lyons, Denver, for Amicus Curiae Colorado Counties, Inc.

David W. Broadwell, Denver, for Amicus Curiae the Colorado Municipal League.

Joseph N. de Raismes, III, Boulder, for Amicus Curiae City of Boulder.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari before judgment, under C.A.R. 50, to review a judgment of the District Court for Archuleta County in favor of the Board of County Commissioners of Archuleta County (Board).[1] The district court held that article X, section 20, of the Colorado Constitution (Amendment 1) did not prohibit the County's electorate from approving a referred measure authorizing re-

---

1. Certiorari was granted on the following two issues:

    1. Does a district satisfy the strictures of Colorado Constitution article X, Section 20(7)(d) by merely obtaining voter approval for the retention and expenditure of excess revenues or must the voter approved "revenue change" mandated by Section 20(7)(d) provide for a

reduction in future revenues to be collected by the district "as an offset" to the expenditure of the excess revenues.

    2. Did the trial court err in holding that the Archuleta County November 1994 ballot issue known as Referred Measure 1BA meets the requirements of Section 20(7)(d).

tention and expenditure of excess revenue collections which exceed Amendment 1 limits. Absent voter approval, Amendment 1 would have required refund of these revenues. Petitioner, F.T. Havens (Havens), contended that the referred measure violated Amendment 1, section (7)(d), for failure to require a revenue reduction in future years to offset the retained revenues, and he sought an injunction requiring refund of the excess revenues. The Board moved for summary judgment. Havens responded with a Motion for Judgment on the Pleadings. There were no material facts in contention, and the district court ruled in favor of the Board. We affirm the judgment.

## I.

On November 8, 1994, the voters of Archuleta County approved Referred Measure 1BA (Referred Measure), by a vote of 1152 to 759. The Referred Measure stated:

PROVIDED THAT NO LOCAL TAX RATE OR MILL LEVY SHALL BE INCREASED WITHOUT FURTHER VOTER APPROVAL, SHALL ARCHULETA COUNTY, COLORADO BE AUTHORIZED TO COLLECT, RETAIN AND EXPEND ALL EXCESS REVENUES AND OTHER FUNDS COLLECTED DURING 1994 AND EXPIRING AFTER 1997 (4 YEARS) WITHOUT FURTHER VOTER APPROVAL EXCEPT FOR STATE GRANTS WHICH COULD BE COLLECTED, RETAINED OR EXPENDED STARTING IN 1994 AND EACH SUBSEQUENT YEAR THEREAFTER, NOTWITHSTANDING THE LIMITATIONS OF ARTICLE X, SECTION 20 OF THE COLORADO CONSTITUTION.[2]

Havens contends that the Referred Measure violates section (7)(d) of Amendment 1, which provides that:

2. The four year term contained in this Referred Measure was drafted, apparently, to correspond with the provisions of Amendment 1, § (3)(a), which we do not construe or interpret in this case.

3. We have been informed by *Amicus Curiae* that 189 ballot issues have been submitted by Colorado municipalities to their electorates for the re-

*If revenue from sources not excluded from fiscal year spending exceeds these limits in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset.* Initial district bases are current fiscal year spending and 1991 property tax collected in 1992. Qualification or disqualification as an enterprise shall change district bases and future year limits. Future creation of district bonded debt shall increase, and retiring or refinancing district bonded debt shall lower, fiscal year spending and property tax revenue by the annual debt service so funded. Debt service changes, reductions, (1) and (3)(c) refunds, and voter-approved revenue changes are dollar amounts that are exceptions to, and not part of, any district base. Voter-approved revenue changes do not require a tax rate change.

(Emphasis added). Havens argues that the Referred Measure must be nullified, and the excess revenues refunded, in that the voter-approved measure did not require Archuleta County to make offsetting revenue reductions in future years equal to the excess revenues authorized to be retained and expended. The Board responds that the Referred Measure is fully effective, in that its electorate has authority to approve retention and expenditure of the excess revenues without regard to a compensating revenue reduction.[3] We agree with the Board.

## A.

Adopted by Colorado's electorate on November 3, 1992, Amendment 1 places limits on the ability of state and local government to tax and spend. *Bolt v. Arapahoe County Sch. Dist. No. Six*, 898 P.2d 525, 527 (Colo. 1995) (*Bolt*). Its provisions require voter approval for certain state and local government tax increases and restrict property, income, and other taxes. *Submission Of In-*

tention and expenditure of excess revenues under § (7)(d). Voters approved 173 of these questions in 138 different municipalities. The county electorates have approved 37 such measures and disapproved 7. We are informed that none of these measures contemplated a future year revenue reduction.

*terrogatories On Senate Bill 93–74,* 852 P.2d 1, 4 (Colo.1993) (*Senate Bill 93–74* ). By adopting Amendment 1, the voters of this state intended to exercise "greater direct control over government growth by, among other things,' setting various spending and revenue limits and requiring voter approval of measures that would increase debt, spending, or taxes." *Zaner v. City of Brighton,* 917 P.2d 280, 284 (Colo.1996) (*Zaner* ).

We have observed that Amendment 1 operates to impose "a *limitation* on the power of the people's elected representatives." *Bickel v. City of Boulder,* 885 P.2d 215, 226 (Colo.1994) (*Bickel* ). While Amendment 1 "circumscribes the revenue, spending, and debt powers of state and local governments," creating a series of procedural requirements, "it does not create any fundamental rights." *City of Wheat Ridge v. Cerveny,* 913 P.2d 1110, 1115 (Colo.1996). Independent of Amendment 1, the people have reserved the right to enact or reject proposed measures at the polls. *Bickel,* 885 P.2d at 226. Amendment 1's election provisions, by including a reference to referred measures, indicate the intent of this constitutional provision to allow voters to consider matters referred to them by state or local government. *See* Amendment 1, § (3)(b). In addition, the General Assembly has defined the term "referred measure" to include any ballot question or ballot issue submitted to its eligible electors by any local governmental entity. § 1–1–104(34.5), 1B C.R.S. (1996 Supp.). Such referred measures encompass "[a]pproval of revenue changes pursuant to section 20(7) of article X of the state constitution." § 1–41–103(4)(d), 1B C.R.S. (1996 Supp.). Interpretations of Amendment 1 which would limit the right of the electorate to vote on tax, spending, debt, or other

proposals are not favored. § 1–41–101, 1B C.R.S. (1996 Supp.).[4]

Voter approval to allow variation from otherwise applicable limits is a key feature of Amendment 1. Amendment 1 "requires voter approval for tax increases and limits spending increases unless approved by the electorate." *City of Aurora v. Acosta,* 892 P.2d 264, 268 (Colo.1995) (*Acosta* ). In the absence of voter approval, collection, retention, or expenditure of revenues in excess of the applicable limits must be refunded with interest. *Id.*

Accordingly, section (4)(a) of Amendment 1, recites that, starting November 4, 1992, voter approval must be obtained in advance for "any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district." Likewise, section (4)(b) requires voter' approval for creation of multiple-fiscal year direct or indirect debt or financial obligation, unless adequate present cash reserves are pledged irrevocably and held to make the necessary payments in all future years.

Revenue and spending increases by state and local government are limited by Amendment 1, section (7). With regard to local government,[5] section (7)(b) provides that "[t]he maximum annual percentage change in each local district's fiscal year spending equals inflation in the prior calendar year plus annual local growth, adjusted for revenue changes approved by voters after 1991 and (8)(b) and (9) reductions."

Under section (7)(c), the "maximum annual percentage change in each district's property tax revenue equals inflation in the prior calendar year plus annual local growth, adjusted

---

**4.** In pertinent part, § 1–41–101 states that:

The general assembly hereby finds, determines, and declares that ... this legislation implements section 20 of article X of the state constitution, which article is entitled "Revenue" and concerns exclusively government revenue raising and appropriations; that section 20 of article X requires public votes on additional government taxes, spending, or debt; that the language of section 20 of article X evinces the public's desire to have more opportunity to vote on government tax, spending, and debt

proposals; that a construction of section 20 of article X that limits local government electors' opportunities to vote on tax, spending, debt, or other proposals would be inconsistent with the ballot title of and the voters' intention in adopting said amendment. . . .

**5.** State and local governments are defined as "districts" for Amendment 1 purposes. " 'District' means the state or any local government, excluding enterprises." Amendment 1, § (2)(b).

for property tax revenue changes approved by voters after 1991 and (8)(b) and (9) reductions." Section (7)(d) provides, in pertinent part, that "[i]f revenue from sources not excluded from fiscal year spending exceeds these limits in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset." [6]

In *Acosta*, 892 P.2d at 268, we interpreted Amendment 1 as requiring voter approval for the collection, retention, or expenditure of revenue increases in three instances: first, where a district proposes any of the forms of revenue increases detailed in section (4)(a); second, where revenues exceed the dollar amounts of the section (7)(b) spending limits; and third, under section (3)(c), where revenues generated by a specific tax increase exceed the estimated maximum dollar amount included in the election notice and ballot title under which voters approved the tax increase.

### B.

In prior cases, we have considered and rejected allegations that local government was retaining and expending excess revenues in violation of Amendment 1.

In *Bolt*, we recognized that "[i]t is evident from the language of Amendment 1 that the voters wanted to reserve for themselves the decisions on whether to increase debt or increase taxes." 898 P.2d at 536. We there held that voter approval, which had been given prior to the adoption of Amendment 1 for indebtedness to be repaid by tax revenue, was to be construed as approval for both the debt and the debt repayment mechanism. *Id.* at 535. We declined "to adopt a rigid interpretation of Colorado Constitution Article X, Section 20(4)(a), which would have the effect of working a reduction in government services." *Id.* at 537.

Likewise, in considering pre-Amendment 1 approval of a vehicle registration fee to fund construction and operation of the E–470 Highway project, we held that the voters, in their initial vote, had already approved collection and expenditure of all revenues from the fee without the necessity of another vote. *Nicholl v. E–470 Pub. Highway Auth.*, 896 P.2d 859, 873 (Colo.1995) (*Nicholl*). We rejected applying the revenue and spending limits of Amendment 1 because the voters had already acted to approve utilization by the governmental entity of all funds derived from the fee. Specifically, we said that "[a]ny increase in revenue collected over that generated by the bond proceeds is therefore a 'voter approved revenue change' and need not be approved again." *Id.*

In summary, Amendment 1 contains a pattern of voter approved measures as exceptions to otherwise applicable limitations. Section (1) provides that "[o]ther limits on district revenue, spending, and debt may be weakened only by future voter approval." We have cited this provision as evidencing that Amendment 1 "was intended to restrain government growth by permitting voter control over government revenue, spending and debt." *Zaner*, 917 P.2d at 285. Sections (3)(c), (4)(a)–(b) and (7)(d) refer to voter approval of tax and revenue increases as exceptions to otherwise applicable Amendment 1 tax, revenue, and spending limitations.

### II.

Here, we are asked to hold that voter approval cannot be given to a measure authorizing governmental retention and expenditure of excess revenue collections, unless the measure also mandates a future compensatory revenue reduction. We are asked to void the legislative action of the voters. The district court concluded, to the contrary, that Amendment 1, section (7)(d), "allows voters to approve revenue changes, which include revenue increases, by offsetting excess revenues collected in a particular year from the spending limits in Section 7 for that year." We agree with the district court.

### A.

Havens would have us interpret the phrase "revenue change as an offset" to require that

---

**6.** Section 7(d) of Amendment 1 also provides that "[d]ebt service changes, reductions, (1) and (3)(c) refunds, and voter-approved revenue changes are dollar amounts that are exceptions to, and not part of, any district base. Voter-approved revenue changes do not require a tax rate change."

offsetting revenue reductions must be paired with the retained excess revenues. Under this interpretation, voters would have no discretion to allow expenditure of excess revenue collections to augment those revenues collected within Amendment 1 limits. Such a view would prohibit voters from authorizing the accomplishment of objectives they deem justified which would not be achieved in the absence of supplementary revenues to the governmental entity.

We were informed at oral argument that Archuleta County proposes to apply the voter-approved excess revenue collections to roadway purposes. If Havens' interpretation were correct, utilizing such funds for this purpose, or any other, would necessitate diminution in the ability of the county to serve its citizens in other arenas. Budget cuts would be required in succeeding years below Amendment 1 levels otherwise applicable for those years, in order to average out the earlier retained revenue collections. Such a result would clearly contradict the straightforward action of the voters in relieving the county of its refund obligation to them by passage of the Referred Measure.

■ Havens' interpretation of section (7)(d) is not sound. First, such a construction would restrict the electorate's franchise in a manner inconsistent with the evident purpose of Amendment 1, which is to limit the discretion of governmental officials to take certain taxing, revenue and spending actions *in the absence of voter approval.* We have emphasized that "substantial compliance" not "strict compliance" is the proper standard to apply with regard to enforcement of the Amendment 1 election provisions, so as not to "unduly restrict the franchise." *Acosta,* 892 P.2d at 267.

Concern for the exercise of the franchise also extends to the ability of the electors to consider the content of measures referred to them by their elected representatives without curtailment by insupportable constructions of Amendment 1. The Referred Measure approved by the Archuleta County voters clearly provides that the County may

retain and expend the excess revenues it collects for the years 1994–1997. Preventing the voters from considering and approving such a measure, in the absence of clear provisions to the contrary, would unduly restrict the electorate's prerogative to allow governmental utilization of funds, which otherwise would be refunded to them, without the necessity of effectuating future budget reductions.

■ Second, Havens' proposed construction of Amendment 1, section (7)(d) does not accord with legitimate voter expectations that Amendment 1, if adopted, would defer to citizen approval or disapproval certain proposed tax, revenue, and spending measures that varied from Amendment 1 limitations. In construing a constitutional amendment, we must take into account "what the people believed the amendment to mean when they accepted it as their fundamental law." *Urbish v. Lamm,* 761 P.2d 756, 760 (Colo.1988); *see also In re Senate Resolution No. 2, Concerning the Constitutionality of House Bill No. 6,* 94 Colo. 101, 113, 31 P.2d 325, 330 (1933) (the intent of those adopting the amendment is controlling and must guide the court's interpretation). A leading argument for the adoption of Amendment 1 was that "voters should be the ultimate authority on matters of taxation and should be trusted to exercise sound judgment." [7]

Third, the General Assembly has construed Amendment 1 as including the approval of revenue changes, under section (7) by means of measures referred to the voters by local government. § 1–1–104(34.5); § 1–41–103(4)(d). In addition, the General Assembly provided that the opportunity of the local electorate to vote on "tax, spending, debt, or other proposals" should not be restricted by construction of Amendment 1 provisions in a manner that would limit voter consideration of referred proposals. § 1–41–101.

Fourth, Havens' view of section (7)(d) conflicts with the clear pattern of Amendment 1 deferring to voter choice in the waiver of

---

**7.** Legislative Council of the Colorado General Assembly—An Analysis of 1992 Ballot Proposals,

10 (argument number 5 for Amendment 1).

otherwise applicable limitations. Section (1) provides that "[o]ther limits on district revenue, spending, and debt may be weakened only by *future voter approval.*" (Emphasis added.) Section (3)(c) limits fiscal year spending "[e]xcept by *later voter approval.*" (Emphasis added.) Sections (4)(a)–(b), likewise, key on the voters' prerogative, as an exception, to consider whether or not to keep in place the Amendment 1 limitations on new taxes, tax rate increases, mill levies above the previous year, and the creation of multiple fiscal year direct or indirect debt. Section (7)'s voter approval provision, as an exception to the revenue and spending limits, continues this pattern of deferral to the electorate.

■ Fifth, we have declined to adopt a "rigid interpretation of [Amendment 1], which would have the effect of working a reduction in government services." *Bolt,* 898 P.2d at 537.[8] The inevitable effect of Havens' construction of section (7)(d) is that voters may never give authority to apply excess revenues to pursue capital, operating, service, or other governmental objectives in addition to those functions government can perform on behalf of its citizenry within Amendment 1 limits.

## B.

Contrary to Havens' argument, the electorate's decision to allow Archuleta County to "collect, retain and expend all excess revenues" over the years 1994 through 1997, as the Referred Measure provides, accomplishes Amendment 1's purpose in providing for voter-retained consideration of whether to take the refund or allow the county to augment its authorized revenues and expenditures. *See Senate Bill 93–74,* 852 P.2d at 4

(Amendment 1 was "designed to protect citizens from unwarranted tax increases.").

■ We have been "guided by a long standing rule of constitutional construction that provisions contained in this state's constitution are to be interpreted as a whole with effect given to every term contained therein." *In re Interrogatories of the United States Dist. Ct. Pursuant to Rule 21.1,* 642 P.2d 496, 497 (Colo.1982). Wherever possible, we must give effect to every word of the provision, *Nicholl,* 896 P.2d at 867, with an eye to "the object which the document as a whole is meant to secure," *In re Estate of Hill,* 713 P.2d 928, 930 (Colo.App.1985) (quoting *Central Hanover Bank & Trust Co. v. Commissioner of Internal Revenue,* 159 F.2d 167, 169 (2d Cir.1947)).

■ In construing a legal provision capable of more than one interpretation, we must consider the purposes which the law was designed to accomplish and the consequences that would flow from alternate constructions, and then adopt the construction that results in harmony rather than inconsistency. *Colorado–Ute Elec. Ass'n, Inc. v. Public Utils. Comm'n of Colo.,* 760 P.2d 627, 635 (Colo. 1988), *appeal dismissed,* 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989).

■ "Offset" is not a term of art defined by Amendment 1 or utilized in a compensatory financial sense in the applicable provision.[9] Rather, read in context, the reasonable meaning of the operating phrase "revenue change as an offset" in section (7)(d) is that voter approval for the excess revenue retention constitutes the required offset to the refund requirement which otherwise would apply. One of two alternatives must occur under section (7)(d). Either the excess revenues are to be refunded or they

---

**8.** Havens argues that we are constrained to accept his interpretation as being that which would "restrain most the growth of government." Amendment 1, § 1. However, this principle of Amendment 1 construction is applicable only if multiple interpretations are equally supported by the text. *See Acosta,* 892 P.2d at 267.

**9.** Havens argues that "revenue change as an offset" means revenue decreases. However, Amendment 1 does not require voter approval for local government to effectuate revenue de-

creases. Rather, Amendment 1 consistently focuses on new tax, revenue, spending, and debt increases as the gist of its concern in limiting government officials from acting in absence of voter approval. Contrary to Havens' contention, our decision in *Acosta* did not equate the term "revenue change" with "revenue decrease." Instead, we were pointing out that voter approval of revenue changes under section (7)(d) is an exception to the otherwise applicable refund requirement. *Acosta,* 892 P.2d at 268 n. 3.

may be retained and expended if the voters so approve. The electorate's approval for retention of the excess revenues as a "revenue change" is the required "offset" to the governmental entity's otherwise applicable refund obligation: "the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset." Amendment 1, § (7)(d). The words Havens would have us read into section (7)(d), "offsetting revenue reduction," nowhere appear in the provision.

■■■ We conclude that the electorate of a governmental entity may authorize retention and expenditure of the excess collection without forcing a corresponding revenue reduction. In *Nicholl,* we characterized pre-Amendment 1 approval and retention of all revenues from a registration fee to fund a highway project as a voter-approved "revenue change," referring to the language of section (7)(d). 896 P.2d at 873.[10] Since the law of initiated and referred measures and the language of Amendment 1 favor placing matters before the voters, we should not adopt a construction of this constitutional provision which would void the electorate's determination, in the absence of clear language to the contrary.[11] We have long held that the Colorado Constitution, "as well as the statutes which implement it, must be liberally construed so as not to unduly limit or curtail the initiative or referendum rights." *Billings v. Buchanan,* 192 Colo. 32, 35, 555 P.2d 176, 178 (Colo.1976); *In re Second Initiated Constitutional Amendment Respecting the Rights of the Pub. to Uninterrupted Serv. by Pub. Employees of 1980,* 200 Colo. 141, 146, 613 P.2d 867, 870 (Colo.1980).

### III.

In sum, the concept of offset utilized in section (7)(d) is that the electorate may counterbalance the governmental entity's duty to refund excess revenues by performing, in favor of that entity, the function reserved to the voters: the people's discretion to approve retention and expenditure of the excess revenue collections rather than taking the refund available to them under Amendment 1.

Thus, we affirm the judgment of the trial court upholding retention and expenditure of excess revenues collected by Archuleta County in accordance with the Referred Measure approved by the county's electorate.

---

**10.** In contrast, the statutory provisions of § 29–1–301(6), 12A C.R.S. (1996 Supp.), limiting local government revenue increases and requiring the division of local government to order revenue reductions in appropriate circumstances, employ the term offset in a manner which clearly indicates legislative intent to match excess revenue collections in one year with a reduction of the authorized revenue of the taxing entity in the subsequent year:

> Where a taxing entity exceeds the limitation imposed by subsection (1) of this section during any year, the division of local government shall order a reduction in the authorized revenue of the taxing entity for the subsequent year in an amount which offsets the excess revenues levied in the preceding year. Such order shall be preceded by notice to the taxing entity of

the proposed order and an opportunity for the taxing entity to respond prior to issuance of the order.

§ 29–1–301(6). Amendment 1, § (1), provides that only voter approval can weaken such applicable statutory limitation. "Other limits on district revenue, spending, and debt may be weakened only by future voter approval." The wording of Archuleta County's referred measure encompassed and complied with this Amendment 1 requirement.

**11.** The Referred Measure in this case did not implicate any of the matters referred to in section (8) of Amendment 1, and we express no opinion with regard to the proper construction or interpretation of that section.