**Douglas BRUCE, Plaintiff–Appellee,**

v.

**CITY OF COLORADO SPRINGS and Kathryn Young, City Clerk, in her official capacity as election officer for the city, Defendants–Appellants.**

**No. 05SA365.**

Supreme Court of Colorado,
En Banc.

Feb. 27, 2006.

Douglas Bruce, Colorado Springs, pro se.

Patricia K. Kelly, City Attorney for Colorado Springs, Shane White, Senior Attorney, Colorado Springs, for Defendants–Appellants.

Colorado Municipal League, Geoffrey T. Wilson, Denver, for Amicus Curiae Colorado Municipal League.

MARTINEZ, Justice.

In this case, we review the summary judgment order of the district court invalidating the voters' approval of a measure to extend an existing sales and use tax for "Trails, Open Space, and Parks" in the April 2003 Colorado Springs municipal election. The trial court found that Issue 1A's election notice did not substantially comply with the requirements of article X, section 20 of the Colorado Constitution or Article VII, section 90 of the Charter of the City of Colorado Springs (collectively "Amendment 1").[1]

1. The relevant provisions of Colo. Const. art. X, sections 20(3)(b)-(c) and Article VII, section 90(c)(3) of the Charter of the City of Colorado Springs are virtually identical. The analysis herein is the same for both provisions with respect to whether a tax extension is the equivalent of a tax increase. We hereinafter refer to "Amendment 1" for both.

The trial court first held the tax extension in Issue 1A was the equivalent of a "tax increase" for purposes of Amendment 1. Although the weight of factors before the trial court suggested that Issue 1A was in substantial compliance with Amendment 1, the trial court found that because Issue 1A failed to meet the additional Amendment 1 election notice requirements pertaining to tax increases, this defect proved fatal to the validity of the election notice.

The resolution of this issue accordingly rests upon the determination of whether a tax extension is a tax increase within the meaning of Amendment 1's election notice provisions. We hold that a tax extension is not a tax increase, and therefore the election notice requirements for tax increases do not apply to Issue 1A. We reverse the judgment of the trial court below.

## I. Facts and Proceedings Below

This dispute arises from a challenge to Issue 1A in an election held by the City of Colorado Springs (the "City") on April 1, 2003. Issue 1A proposed to extend the existing 0.1% sales and use tax for "Trails, Open Space, and Parks" from its slated expiration of April 30, 2009, to December 31, 2025. The ballot title for Issue 1A states:

> Without raising additional taxes, shall the existing 0.1% (one-tenth of a cent) City sales and use tax for Trails, Open Space and Parks (TOPS) be extended from its current expiration of April 30, 2009 through December 31, 2025 ... as a voter-approved revenue change, the above constituting no changes to the program except allowing no more than 6% be used for stewardship and maintenance of TOPS-funded trails, open space and parks and no more than 3% be used for program management?

Issue 1A was approved by the voters of Colorado Springs.

Plaintiff, Douglas Bruce, initially challenged the election contending it violated Amendment 1. He also challenged the factual summary for alleged violations of the Fair Campaign Practices Act (FCPA), sections 1–45–101 to –118, C.R.S. (2003).

Bruce sought damages, a declaratory judgment proclaiming Issue 1A illegal and void, and an injunction preventing the City from counting ballots on Issue 1A, revealing the results of the count, spending additional money on Issue 1A, or conducting any further proceedings with regard to Issue 1A. Bruce also alleged bad faith on the part of Defendants, the City and the City Clerk, Kathryn Young. He sought a court order to prevent any further involvement in the April 1, 2003 election by Young and the substitution of the El Paso County Clerk and Recorder in her place for the purpose of performing her election duties.

The City moved to dismiss all of Bruce's claims or, in the alternative, for summary judgment. As there were no disputed issues of fact, the trial court treated Bruce's response as a cross-motion for summary judgment.

In a written order, the trial court granted Bruce's cross-motion for summary judgment on his claim that the Issue 1A election notice violated Amendment 1. Following review of the alleged Amendment 1 infirmities in the election notice, the trial court determined the key issue in resolving whether Issue 1A's election notice was in substantial compliance with Amendment 1 was whether the ballot title requirements for "tax increases" in section (3) of Amendment 1 applied to Issue 1A.

Section (3) sets forth a number of requirements for the form and content of a ballot title. Additional title requirements apply when the ballot issue involves a tax or debt increase. Section (3) is silent, however, with respect to tax extensions. Accordingly, the trial court attempted to resolve whether a "tax extension" is a "tax increase" in the context of section (3). The court read "tax increase" broadly to include "tax extension" and thereby found that the additional ballot title requirements for tax increases applied to the election notice of Issue 1A. The court recognized this determination as pivotal to whether the election notice was otherwise in substantial compliance with Amendment 1. In a footnote, the court noted that if it had determined the election notice requirements for tax increases did not apply to Issue 1A, it

"would have found substantial compliance despite the other [Amendment 1] infirmities."

The trial court dismissed Bruce's remaining claims in favor of the City. Bruce's direct challenge to the form of the ballot title was dismissed because the trial court found that Bruce failed to comply with the procedural requirements for challenging the City election pursuant to the Uniform Election Code, section 1–11–203.5(2), C.R.S. (2003). This provision requires ballot title challenges to be brought within five days of setting the ballot title. Bruce did not contest the City's averment that the challenge was not brought within the five-day period. Consequently, the trial court found for the City and barred Bruce's ballot title claim.[2]

The trial court also dismissed Bruce's claims alleging violations of the FCPA in the factual summary on the basis that Bruce had already availed himself of the exclusive remedy for his claim. The court found that under the FCPA, the remedy for contesting the factual summary of a ballot issue is to file a complaint with the Colorado Secretary of State and follow the appropriate procedures. Bruce followed those procedures, lost on his claim following a hearing before an administrative law judge, and did not appeal.

Last, the trial court found no bad faith on the part of the City Clerk, Kathryn Young. After initially taking the position that no comments would be received, the City reversed its position after Bruce appeared at the City Clerk's office on the final day for comment submission[3] and insisted that the Clerk's office accept his comments. The City Clerk then solicited comments from a proponent of Issue 1A shortly before the 5:00 p.m. deadline. The trial court found the City Clerk's actions were not in bad faith, but that the City did not afford the public "any reasonable opportunity to further the purposes

of [Amendment 1] with the submission of comments."

The City now appeals the decision of the trial court granting summary judgment in favor of Bruce on the basis that the election notice of Issue 1A was not in substantial compliance with Amendment 1. Bruce does not cross-appeal any of the other issues. Thus, we address only the trial court's decision to grant summary judgment in favor of Bruce on the election notice issue. Specifically, we look at whether Amendment 1's election notice requirements for tax increases apply to tax extensions, that is, whether a "tax extension" is appropriately termed a "tax increase." Because the trial court's conclusion that a tax extension is the equivalent of a tax increase has implications for the election notice beyond the form and content of the ballot title, a ruling on the ballot title provisions alone would not resolve whether the election notice of Issue 1A was in substantial compliance with Amendment 1. Therefore, we examine the meaning of "tax increase" with respect to the ballot title requirements and as it appears in the other election notice provisions.

We conclude a tax extension is not a tax increase within the meaning of Amendment 1's election notice provisions. Accordingly, the election notice requirements for tax increases do not apply to Issue 1A. The trial court erred as a matter of law when it determined as a preliminary matter that the election notice requirements for tax increases apply to tax extensions and, consequently, the notice of election was not in substantial compliance with Amendment 1. Thus, we reverse the summary judgment of the trial court.

## II. Jurisdiction

Upon request of the court of appeals, we accepted transfer of this case under section 13–4–110(1)(a), C.R.S. (2005).[4] The court of

---

2. Although the court dismissed Bruce's statutory challenge to the ballot title pursuant to the five-day limit imposed by section 1–11–203.5(2), the trial court nonetheless considered the ballot title infirmities in its analysis of whether the notice of election for Issue 1A was in substantial compliance with Amendment 1, citing *Cacioppo v. Eagle County School Dist. RE–50J*, 92 P.3d 453, 463 (Colo.2004) (statute does not bar constitutional

challenges to the substance of a ballot issue or ballot question).

3. Colo. Const. art. X, section 20(3)(b)(v) requires written comments to be filed with the election officer by 45 days before the election.

4. Section 13–4–110(1)(a) provides:

appeals has original jurisdiction for appeals from the district court concerning proceedings initiated under article X, except for summary proceedings. § 13–4–102(1)(g), C.R.S. (2005);[5] *see Busse v. City of Golden,* 73 P.3d 660, 662 (Colo.2003). We exercise jurisdiction here because the subject matter of this case concerns a significant state constitutional question of first impression.

### III. Analysis

■■■ Claims brought to enforce Amendment 1's election provisions are measured by a "substantial compliance" standard. *Bickel v. City of Boulder,* 885 P.2d 215, 227 (Colo. 1994). Elections will be set aside only where clear grounds for such action exist. *See id.; see also F.T. Havens v. Bd. of County Comm'rs,* 924 P.2d 517, 524 (Colo.1996). In *Bickel,* we set forth a number of factors to consider when determining whether a measure substantially complies with Amendment 1:

> (1) the extent of the district's noncompliance with respect to the challenged ballot issue, that is, a court should distinguish between isolated examples of district oversight and what is more properly viewed as systemic disregard of Amendment 1 requirements, (2) the purpose of the provision violated and whether that purpose is substantially achieved despite the district's noncompliance, and (3) whether it can reasonably be inferred that the district made a good faith effort to comply or whether the district's noncompliance is more properly viewed as the product of an intent to mislead the electorate.

885 P.2d at 227. The substantial compliance test and the *Bickel* factors are appropriately applied to an Amendment 1 challenge to a notice of election. *See City of Aurora v. Acosta,* 892 P.2d 264, 270 (Colo.1995).

When a party in interest alleges, or the court is of the opinion, that a case before the court of appeals is not properly within the jurisdiction of the court of appeals, the court of appeals shall refer the case to the supreme court. The supreme court shall decide the question of jurisdiction in a summary manner, and its determination shall be conclusive.

**5.** Section 13–4–102 states in relevant part:

Here, the trial court acknowledged the *Bickel* factors and applied them accordingly. The court found the election notice did not substantially comply with Amendment 1 because of a number of defects, including the failure to satisfy all of the ballot title requirements of section (3), the omission of financial estimates, and the apparent lack of good faith by the City to comply with Amendment 1 because of the underlying ballot title errors.

The court indicated, however, that its decision hinged upon the applicability of the election notice requirements for tax increases. The court found that, but for the finding that Issue 1A violated these requirements, Issue 1A would have been in substantial compliance with Amendment 1 notwithstanding the other defects. The outcome turned directly upon the preliminary legal question of whether a "tax extension" constitutes a "tax increase" under section (3) of Amendment 1. We focus our analysis on this narrow issue.

### A.

■■■ The "[i]nterpretation of a constitutional provision is a question of law that we review de novo." *Rocky Mtn. Animal Def. v. Colo. Div. of Wildlife,* 100 P.3d 508, 513 (Colo.App.2004). Where ambiguities exist, we interpret constitutional provisions as a whole and attempt to harmonize all of the contained provisions. *Id.* at 513–14 (citing *Zaner v. City of Brighton,* 917 P.2d 280, 283 (Colo.1996)); *see Bickel,* 885 P.2d at 229. We also give effect to the intent of the electorate in adopting the amendment. *See Zaner,* 917 P.2d at 288; *Rocky Mtn. Animal Def.,* 100 P.3d at 513.

■■■ In assessing the intent of the voters, we look to the language of the text and accord words their plain and ordinary meaning. *Town of Telluride v. Lot Thirty–Four*

(1) Any provision of law to the contrary notwithstanding, the court of appeals shall have initial jurisdiction over appeals from final judgments of the district courts, the probate court of the city and county of Denver, and the juvenile court of the city and county of Denver, except in: ... (g) Summary proceedings initiated under articles 1 to 13 of title 1 and article 10 of title 31, C.R.S.

*Venture, L.L.C.*, 3 P.3d 30, 35 (Colo.2000); *Rocky Mtn. Animal Def.*, 100 P.3d at 514. Further, in examining the plain language, we do not "read a statute to create an exception that the plain language does not suggest, warrant, or mandate." *Lot Thirty–Four Venture, L.L.C.*, 3 P.3d at 35.

As this constitutional provision was enacted by voter initiative and is not a statute enacted by the legislature, we do not assume that all legislative drafting principles apply. Initiatives are not subject to the same drafting processes as statutes. Nonetheless, we apply generally accepted principles, such as according words their plain or common meaning. We thereby enact the intent of the voter in the same manner as we would otherwise seek to enact the intent of the legislature.

### B.

Section (3) requires election notice titles to state in order of preference: "NOTICE OF ELECTION TO INCREASE TAXES/TO INCREASE DEBT/ON A CITIZEN PETITION/ON A REFERRED MEASURE." Colo. Const. art. X, § 20(3)(b). Accordingly, election notice titles for tax increases must begin with the phrase "NOTICE OF ELECTION TO INCREASE TAXES." *Id.* The subsections of section (3)(b) go on to specify additional requirements for election notices:

(i) The election date, hours, ballot title, text, and local election office address and telephone number.

(ii) For proposed district tax or bonded debt increases, the estimated or actual total of district fiscal year spending for the current year and each of the past four years, and the overall percentage and dollar change.

(iii) For the first full fiscal year of each proposed district tax increase, district estimates of the maximum dollar amount of each increase and of district fiscal year spending without the increase.

(iv) For proposed district bonded debt, its principal amount and maximum annual and total district repayment cost, and the principal balance of total current district bonded debt and its maximum annual and remaining total district repayment cost.

(v) Two summaries, up to 500 words each, one for and one against the proposal, of written comments filed with the election officer by 45 days before the election. No summary shall mention names of persons or private groups, nor any endorsements of or resolution against the proposal. Petition representatives following these rules shall write this summary for their petition. The election officer shall maintain and accurately summarize all other relevant written comments. The provisions of the subparagraph (v) do not apply to a statewide ballot issue, which is subject to the provisions of section 1(7.5) of article V of this constitution.

Colo. Const. art. X, § 20(3)(b)(i)-(v). While all ballot issues must comply with subsections (i) and (v), an election for a tax increase must also comply with subsections (ii) and (iii). *Id.* Section (3)(c) also requires ballot titles for tax increases to begin "SHALL (DISTRICT) TAXES BE INCREASED (first, or if phased in, final, full fiscal year dollar increase) ANNUALLY...?" Colo. Const. art. X, § 20(3)(c). The requirements in sections (3)(b) and (3)(c) apply explicitly to tax increases but make no mention of tax extensions. *See id.*

### 1.

◼ In our analysis of section (3), we initially confront the problem that Amendment 1 does not provide a definition for either "increase" or "extension." Section (2) of Amendment 1 sets forth a number of preliminary definitions including "enterprise," "fiscal year spending," and "inflation." Colo. Const. art. X, § 20(2). However, the term "tax increase" is not defined in section (2), section (3), or any other provision of Amendment 1.[6] Likewise, "tax extension" also lacks any clarification in Amendment 1, and an

---

**6.** Both Colo. Const. art. X, section 20(2) and Art. VII, section 90(b) of the Charter of the City of Colorado Springs set forth definitions for a number of terms contained within their respective provisions. Neither of those sections provides guidance here, however, as the definitions for "tax increase" and "tax extension" are not included within either section.

"extension of an expiring tax" appears only in section (4)(a) of Amendment 1.[7]

Before turning to the plain language of section (3), we first discuss Bruce's statutory construction argument in favor of including "tax extension" within the meaning of "tax increase." Bruce argues the inclusion of a tax extension in section (4)(a) should be the basis for an expansive reading of "tax increase" in section (3). Specifically, Bruce contends section (4)(a) illustrates the forms a tax increase may take and thereby acts as a definitional provision for "tax increase." Section (4) states in relevant part:

> ... *districts must have voter approval in advance for:* (a) Unless (1) or (6) applies [annual district revenue is less than annual payments on general obligation bonds, pensions, and final court judgments, or in case of emergency], *any new tax, tax rate increase,* mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or *extension of an expiring tax,* or a tax policy change directly causing a net tax revenue gain to any district.

Colo. Const. art. X, § 20(4) (emphasis added).

We find several flaws with Bruce's interpretation of section (4)(a). First, Amendment 1 already contains a definitional provision that precedes the election notice requirements section. *See* Colo. Const. art. X, § 20(2). When viewed as a whole, the logical approach to interpreting Amendment 1 is to look to section (2) for definitions, and not to dispersed sections having purposes quite apart from providing term definitions. The practical means to define "tax increase" by the items enumerated in section (4)(a) would have been to incorporate said definition into section (2), and not, as Bruce suggests, to imply a definition via a subsequent statutory provision.

Second, as noted above, section (4)(a) has a separate and limited purpose from both sec-

tions (2) and (3). Section (4)(a) sets forth which elections require advance voter approval. It does not concern either term definitions or the election notice requirements of sections (2) and (3) respectively. The election notice requirements are related only to the advance voter approval requirements insofar as both serve the same underlying purpose of accurately informing the electorate of proposed measures. Otherwise, they have distinct and rather narrow functions. The relevant portions of section (3) set forth requirements for a valid election notice, including detailed language requirements for a valid election notice title and valid ballot title, whereas section (4)(a) determines which types of elections demand advance voter approval. Colo. Const. art. X, §§ 20(3)(b), 20(3)(c), 20(4)(a). The plain language and purposes of these provisions offer no compelling reason to extend the reach of the items enumerated in section (4)(a) to section (3).

Third, the inclusion of "an extension of an expiring tax" in section (4)(a) and omission of any reference to tax extensions in section (3) is significant. In comparing the two provisions, we note that tax extensions were clearly contemplated at the time Amendment 1 was drafted, as evidenced by the inclusion of tax extensions in section (4)(a). While a tax extension appears in section (4)(a), it does not appear in section (3). Because we find no indication in either the plain language or structure of Amendment 1 to suggest that this omission was not deliberate, we decline to interpret section (4)(a) expansively where the opportunity to extend the election notice requirements to include tax extensions was plainly available.

For these reasons, we find section (4)(a) does not guide our understanding of the term "tax increase" as it appears in section (3).

## 2.

Turning, then, to the language of section (3), itself, we assess the plain meaning of "tax increase" as it appears in that section.

---

**7.** The language in Section 90 of the Charter of the City of Colorado Springs largely mirrors this section. It states:

> The following require voter approval in advance:
> (1) Except as provided by (f), *any new tax, tax rate increase,* mill levy above that of the prior

year, *tax extensions,* or tax exemption termination, or any change in City tax policy that directly provides a net gain in City or enterprise tax revenue above the level that would otherwise exist.

§ 7–90(d)(emphasis added).

In examining "tax increase" as it appears in Amendment 1, we look to the intent of the voter as it is an initiated constitutional provision. *See In re Interrogatories Relating to the Great Outdoors Colo. Trust Fund,* 913 P.2d 533, 538 (Colo.1996) ("[A] court's duty in interpreting a constitutional amendment is to give effect to the will of the people in adopting such amendment."). We also consider how the typical voter would interpret "tax increase," because our concern here is how the form of the election notice affects a voter's understanding of a proposed measure. Accordingly, we consider whether the practical, everyday meaning of "increase" is synonymous with "extension."

A tax "extension" suggests the continuation of a tax, whereas a tax "increase" suggests a greater amount will be taxed. Accordingly, a proposal to "extend" a tax implies that neither the amount nor rate of the tax will change from its current rate. Likewise, a tax "increase" indicates that the tax burden borne by an individual taxpayer will be greater than its present amount. The former indicates a continuation of the status quo, whereas the latter suggests a change that will impose a greater cost on the taxpayer.

Bruce asks us to interpret "tax increase" more broadly, in effect suggesting that all forms of revenue increases are essentially tax increases. This definition is both inaccurate and overbroad.

An increase in a tax's duration does not necessarily imply an "increase" merely because both result in a net revenue gain. For example, an increase in the number of taxpayers—without any change in a given tax— would lead to an increase in net revenue. However, few would consider this to be a "tax increase" according to its everyday meaning. The tax burden upon an individual taxpayer has not changed, and the tax has not increased in any meaningful sense. Thus, although a tax increase may result in a revenue increase, the two are neither contiguous in scope nor synonymous. *See generally Acosta,* 892 P.2d at 268–69. Hence, we reject Bruce's suggestion that revenue increases are the equivalent of tax increases.

The plain and ordinary meaning of the term "tax increase" does not appear to encompass a "tax extension." However, because the issue appears close, we also consider the purposes of the election notice provisions of Amendment 1 in deciding whether to accept an expanded meaning of "tax increase" in lieu of its plain and ordinary meaning.

### 3.

Ambiguities in Amendment 1 are generally to be resolved to effectuate Amendment 1's stated purpose of reasonably restraining the growth of government. *See* Colo. Const. art. X, § 20(1); *Nicholl v. E–470 Pub. Highway Auth.,* 896 P.2d 859, 867 (Colo.1995); *Bickel,* 885 P.2d at 229. However, we also recognize that the election notice provisions serve additional purposes for which we must account when interpreting those provisions. Namely, the primary purpose of the election notice provisions is "to provide the electorate with the information necessary to make an intelligent decision on ballot issues involving debt and/or tax increases." *Bickel,* 885 P.2d at 236; *see also* Legislative Council of the Colorado General Assembly, *An Analysis of 1992 Ballot Proposals* 10 (1992). Accordingly, we also resolve ambiguities in light of this purpose, provided there are no overt conflicts with Amendment 1's broader purpose of reasonably restraining the growth of government.

At the outset, we note that a tax extension does not evoke the specter of unchecked government growth contemplated by Amendment 1. While a tax or debt increase leads to a greater burden on taxpayers and, in all likelihood, greater government spending, a tax extension merely maintains the present taxpayer burden and size of government. Where the size of government is neither expanding nor contracting, the concerns underlying Amendment 1 are largely peripheral.

In contrast, the principle underlying the election provisions, i.e., that the electorate should be provided with sufficient information to make intelligent decisions on ballot issues, is directly at issue in this case. *See Bickel,* 885 P.2d at 236. Whether the elec-

tion notice title and the ballot title of a tax extension must be titled "TAX INCREASE" and conform to the other section (3) requirements that apply to tax increases directly influences the perception and understanding of the voters.[8]

Here, we find that applying the additional section (3) requirements for tax increases to tax extensions is more likely to cause confusion than assist the voters. A tax extension is not synonymous with a tax increase. To suggest otherwise runs the risk of significantly misleading the voters. By expanding the definition of a tax increase beyond its plain meaning to include tax extensions, voters may be led to believe that the election involves something more than an extension of a present tax. Labeling the extension an "increase" suggests that the costs of the tax will be greater than present levels, and thereby risks confusing the electorate.

■ Here, for example, Issue 1A does not substantively change the existing sales and use tax or its proposed use of the revenue. The extension lengthens the time period of the tax and directs the tax revenue to the same expenditures approved by the voters in the original ballot proposal.[9] The typical voter would not interpret the tax extension proposed in Issue 1A to be anything more than a continuation of the status quo. Accordingly, to accurately inform the voter, the tax is properly termed a "tax extension" and not a "tax increase."

Further, when we look to the particular language used in the ballot title of Issue 1A's election notice, the language does not seem confusing or ambiguous. The ballot title of Issue 1A states in relevant part:

*Without raising additional taxes, shall the existing* 0.1% (one-tenth of a cent) City sales and use *tax* for Trails, Open Space and Parks (TOPS) *be extended* from its

current expiration of April 30, 2009 through December 31, 2025 . . .

(Emphasis added). The ballot title accurately describes the nature of the proposal as a tax extension and does not confuse the reader by conflating "extension" with "increase." In contrast, if we were to reword the title in terms of a tax increase and begin the ballot title with "SHALL . . . TAXES BE INCREASED . . . ," the election notice would immediately beg clarification. The same problem arises with respect to the title of the election notice which began here with "NOTICE OF ELECTION ON A REFERRED MEASURE." Rewording it to begin with "NOTICE OF ELECTION TO INCREASE TAXES," would demand explanation. While such clarification is certainly feasible, this method of title drafting is needlessly circuitous. A better approach is one that calls for clarity and precision, allowing the voters to reach an informed and intelligent understanding of the proposal without unnecessarily confusing the issue.

## IV. Conclusion

After examining the various arguments for an expanded reading of "increase," we reject these arguments in favor of the plain language of section (3). We are not persuaded by Bruce's suggestion that section (4)(a) serves as a definitional provision for section (3), nor by his assertion that the plain meaning of "increase" should be liberally construed in place of its plain and ordinary meaning. In sum, we find no compelling reason to deviate from the plain language of Amendment 1 entailing the adoption of an expansive definition of the term "increase" to encompass "extension."

The election notice provisions serve to inform the voters, and an unnecessarily broad definition of "increase" would lead to potential confusion in contravention of that pur-

---

8. This also comports with the mandate given to the state title board to set titles that "correctly and fairly express the true intent and meaning" of a proposed law. *See* § 1–40–106(3)(b), C.R.S. (2005).

9. The original election notice from April 1, 1997, substantially complied with the Amendment 1 ballot title requirements for tax increases. The title stated: "Shall City taxes be increased

$5,500,000 annually and amounts raised thereafter from 0.10% sales and use tax expended by initiated ordinance for building trails, neighborhood parks, and preserving open space?" The ballot text and the general provisions of the original 1997 proposal remain essentially unchanged in the proposed April 2003 extension discussed herein.

pose. Accordingly, we reject the trial court's legal determination that an extension of an expiring tax is equivalent to a tax increase. Consistent with this finding, the additional ballot title requirements of section (3) that apply to tax increases do not apply to Issue 1A. Therefore, we reverse the order of the trial court granting summary judgment for Bruce.

COATS, J., dissents.

Justice COATS, dissenting.

Today the majority excuses a local government's calculated refusal to provide the notice required for proposed tax increases by the popularly adopted Taxpayer's Bill of Rights, holding that the term "tax increase" was never intended to include the imposition of a future tax, despite clearly requiring voter approval, as long as it does not exceed the amount of a previous tax earmarked for the same purposes. I consider the majority's interpretation of the term "tax increase" (as well as its understanding of the words "plain and ordinary meaning") to be so strained as to demand some expression of opposition. I therefore respectfully dissent.

The majority's (somewhat) condescending rejection of any other reading rests on its unstated (and to my mind clearly erroneous) assumption that the term "tax increase" is limited to increases in the tax burden under which the taxpayers labor at the time voter approval is sought for additional tax revenues. When the majority speaks of "present" tax levels and "existing" sales and use taxes, maj. op. at 996, it refers to levels of taxation preceding the election, rather than the burden to which taxpayers will be subject, barring their approval of a greater amount, in the applicable tax period. The plain and ordinary meaning of the term "tax increase," however, would seem to be much less cramped and encompass any tax for which the approval of the voters is required. Even if this constitutional language, in the abstract, could reasonably be limited to future tax levels exceeding those to which taxpayers had previously been subjected, such a construction could not be squared with the remaining provisions of TABOR or its clear

purpose of expanding voter oversight of the taxation process.

In rejecting the possibility of a different construction, the majority fails to even consider whether the status quo against which a proposed tax measure should be compared is actually the tax burden that already exists for the period in question, in the absence of additional voter-approved taxes. Instead, it disparages the arguments advanced by the taxpayer-appellee by erecting and knocking down various straw men having little relation to his actual objections. Finally, it concludes by suggesting that its interpretation is supported by the fact that the electorate would merely have been confused by notification that subjecting itself to a future 0.1% sales and use tax would actually amount to approving a tax increase.

With regard to the taxpayer's assertion that subsection (4)(a) identifies the extension of an expiring tax as a particular kind of tax increase, the majority finds it implausible that the term "tax increase" could be intended to include tax extensions, largely because the definitional provision of TABOR contains no specific definition of "tax increase," expressly including extensions, *see* maj. op. at 994, and because no explicit reference to tax extensions appears along with the term "tax increase" in subsection (3), separately triggering the same notice requirements for the extension of expiring taxes. *See* maj. op. at 994. Of course, none of the tax measures singled out in subsection (4)(a) for voter approval appear individually in subsection (3), allowing the natural inference that repeating them each by name would be redundant in light of subsection (3)'s blanket reference to any "tax increase."

Instead, "extension of an expiring tax" appears only in subsection (4)(a) as one of a number of tax measures requiring voter approval, including any "new tax," any "tax *rate* increase," any "mill levy above that for the prior year," any "valuation for assessment ratio increase for a property class," and any "tax policy change directly causing a net tax revenue gain to any district," Colo. Const. Art. X, § 20(4)(a) (emphasis added), all of which clearly designate techniques for increasing taxes beyond what they would be

without such action. The broader term, "tax increase," appears only in subsection (3), which sets out the particular notice requirements for ballot issues that would increase either taxes or debt—the former clearly corresponding to the measures described in (4)(a) and the latter corresponding to those described in (4)(b). Presumably the majority does not intend that any "new tax" or "tax rate increase" be excluded from the rubric of "tax increase," like any "extension of an expiring tax," merely because these terms are also not repeated in subsection (3).

Contrary to the majority's characterization of the "plain language or structure" of subsections 3 and 4, maj. op. at 994, read together these two provisions evidence an unmistakable attempt to foreclose precisely the kind of subterfuge sanctioned by the majority today. Ironically, the majority relies on TABOR's failure to fully repeat, in subsection (3), subsection (4)(a)'s explicit identification of various ways of characterizing or structuring tax increases as support for its assertion that subsection (4)(a) was never intended as an enumeration of specific examples of tax increases at all. Whether or not the majority's rationale logically dictates that the other tax measures enumerated in subsection (4)(a) also be exempt from the notice requirements of subsection (3), it does make clear its understanding that The Taxpayer's Bill of Rights mandates voter approval for certain tax measures, despite their failure to qualify as either tax increases or increases in public debt.

The majority also criticizes the taxpayer for seeking an overly broad or expansive definition of "tax increase," to include "all forms of revenue increases." Whether this is an accurate description or not, it is hardly relevant to the matter before the court today, which is the approval of a tax that could not otherwise exist. Unlike the majority's hypothetical of "a net revenue gain" without changing tax burdens for individual taxpayers, maj. op. at 995, the "extension of an expiring tax," at issue here, clearly increases the tax burden beyond that under which individual taxpayers would have labored without the extension.

Finally, the failure to comply with TABOR's notice requirements in this instance was not simply a technical omission, belatedly asserted by taxpayers as a means of nullifying election results with which they were displeased. The matter was raised well before the election, and the municipality consciously chose not to give notice or identify the measure as a proposed tax increase. On the contrary, the ballot title for this tax measure expressly indicated that approving the measure would *not* raise additional taxes, a deceptive statement, accurate only in the narrow sense validated by the majority today. By failing to treat this "extension of an expiring tax" as a tax increase, the municipality was able to raise additional tax revenues, requiring voter approval, without ever informing the electorate of its estimate of the maximum dollar amount to be raised by approving the measure or its estimate of fiscal year spending without that amount. *See* Colo. Const. Art. X, § 20(3)(b)(iii).

Surely a fair reading of the Taxpayers' Bill of Rights leads inexorably to the conclusion that this is an example of precisely what the amendment was designed to prohibit. Nor do I believe the doctrine of "plain meaning" provides the majority any refuge. Particularly, in this context, I fear that the majority's plain meaning explanation—that "tax increase" can only mean an increase in the taxes taxpayers have been paying rather than an increase in the taxes they would be required to pay without an extension— sounds so farfetched as to evoke the suggestion of legal artifice and undermine confidence in our protestations that we merely acknowledge the only reasonable meaning of, and therefore the voters' intent embodied in, the constitutional language itself.

Because I believe the plain and ordinary meaning of the term "tax increase," in context, must include the "extension of an expiring tax," and that the clear intent of TABOR is not only to require voter approval for such an extension but also to provide the voters sufficient information to make a rationale choice, I respectfully dissent.