Roxy HUBER, in her capacity as Executive Director of the Department of Revenue, State of Colorado; the Colorado Department of Revenue; and the State of Colorado, Petitioners

v.

COLORADO MINING ASSOCIATION; Twentymile Coal Company; Mountain Coal Company, LLC; Colowyo Coal Company, L.P.; Oxbow Mining, LLC; Trapper Mining, Inc.; and Bowie Resources, LLC., Respondents.

No. 10SC220.

Supreme Court of Colorado, En Banc.

Oct. 31, 2011.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, Matthew D. Grove, Assistant Attorney General, Denver, Colorado, Attorneys for Petitioners.

Moye White LLP, Paul M. Seby, Marian C. Larsen, Denver, Colorado, Attorneys for Respondents.

Featherstone Petrie DeSisto LLP, Matthew A. Morr, Denver, Colorado, Attorneys for Amici Curiae Colorado Association of Commerce and Industry; Denver Metro Chamber of Commerce.

Rothgerber Johnson & Lyons LLP, Thomas J. Dougherty, Denver, Colorado, Attorneys for Amicus Curiae Tri–State Generation and Transmission Association, Inc.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari in this case to review the court of appeals' decision in *Colorado Mining Ass'n v. Huber*, 240 P.3d 453 (Colo.App.2010).[1] The court of appeals ruled that Article X, Section 20 of the Colorado Constitution ("Amendment 1") requires statewide voter approval each time the Colorado Department of Revenue ("Department") calculates an increase in the amount of tax due per ton of coal extracted as directed by the tax rate formula contained in section 39–29–106, C.R.S. (2011). We disagree and reverse.

Adopted by the General Assembly in 1988, the statute establishes a tax with a tax rate that has two components to calculate the amount of tax owed: (1) a base rate of thirty-six cents per ton of coal extracted and (2) a quarterly one percent increase or decrease to the base rate based on changes to the index of producers' prices prepared by the United States Department of Labor.

■ Effective November 4, 1992, following its approval by voters in the 1992 general election, section (4)(a) of Amendment 1 requires governmental entities to obtain voter approval before imposing "any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain to any district." Accordingly, Amendment 1 places a check by the electorate on the exercise of legislative taxing power. *See Barber v. Ritter*, 196 P.3d 238, 247 (Colo.2008); *Bickel v. City of Boulder*, 885 P.2d 215, 226 (Colo. 1994).

After Amendment 1 went into effect, the Department suspended employing the mechanism set forth in section 39–29–106(5) for calculating upward adjustments in the amount of coal severance tax owed based on inflation. Following a State Auditor's review in 2006, an Attorney General's opinion, and a

---

1. The issue presented for review is:
   Whether application of a statutory provision enacted before the adoption of the Colorado Taxpayer's Bill of Rights, Colo. Const. art. X,

§ 20, which increases taxes based on an inflation adjustment factor tethered to an external economic index, amounts to a tax rate increase requiring statewide voter approval.

rulemaking proceeding—all of which concluded that implementation of this pre–Amendment 1 statute is a non-discretionary administrative function required of the Department—the Department in 2008 recommenced applying the statute to calculate the amount of tax due. Implementation of the statute resulted in a tax of $0.76 per ton of coal extracted compared to $0.54 per ton, the amount collected at the time Amendment 1 passed sixteen years before.

The Colorado Mining Association and taxpayer coal companies (collectively, "Colorado Mining") filed an action challenging collection of the $0.76 per ton amount. Colorado Mining asserts that, whenever the Department calculates an upward adjustment in the amount of tax due under the statute, it must obtain voter approval. The court of appeals agreed. We disagree.

We hold that section 39–29–106(1) and (5) establishes a tax rate that contains two components: a base rate of "thirty-six cents per ton of coal" plus the non-discretionary adjustment factor that is "based upon changes to the index of producers' prices." The Department's implementation of section 39–29–106 is not a "tax rate increase," but a non-discretionary duty required by a pre–Amendment 1 taxing statute which does not require voter approval. Accordingly, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court, which held that the Department must implement section 39–29–106 as written.

## I.

In 1977, the Colorado General Assembly enacted a severance tax on various minerals removed from lands in Colorado. Colorado's severance tax is intended to recapture a portion of the State's wealth that is irretrievably lost when nonrenewable natural resources are extracted from Colorado soils and sold for private profit. *See* § 39–29–101(1) (legislative declaration).

Section 39–29–106 does not tie the severance tax for coal directly to its market price, but expresses the tax as a formula that contains a base rate plus an adjustment mechanism designed to ensure the tax responds to changes in inflation and more fairly reflects the market value of the resource. The statute directs the Department to make quarterly adjustments based on increases or decreases in a broad economic index, the producer price index ("PPI").[2] § 39–29–106(5). Thus, under the statute, the Department must collect a tax of thirty-six cents per ton of coal extracted, plus or minus 1 percent every time the PPI changes by 1.5 percent.[3] *Id.*

Subsections (1) and (5) function together to establish the coal severance tax rate, which the General Assembly enacted prior to the passage of Amendment 1:

(1) In addition to any other tax, there shall be levied, collected, and paid for each taxable year a tax upon the severance of all coal in this state. Such tax shall be levied against every person engaged in the severance of coal. Subject to the exemption and credits authorized in subsections (2), (3), and (4) of this section, *the rate of the tax shall be thirty-six cents per ton of coal.*

. . . .

(5) For every full one and one-half percent change in the index of producers' prices for all commodities prepared by the bureau of labor statistics of the United States department of labor, *the tax rate provided in subsection (1) of this section shall be increased or decreased one percent.* The executive director shall determine such adjust-

---

2. The PPI measures the wholesale price index and is compiled by the United States Department of Labor, Bureau of Labor Statistics. For more information see *http://www.bls.gov/ppi/*.

3. The thirty-six cents per ton base rate plus one percent adjustment based on the PPI have remained unchanged in the statute since 1988. *See* ch. 285, secs. 1–2, § 39–29–106, 1988 Colo. Sess. Laws 1344, 1344. In that 1988 bill, the General Assembly lowered the base rate to thirty-six cents per ton from sixty cents per ton, with the base rate to increase back to sixty cents per ton on July 1, 1994. *Id.* sec. 1. In 1994, the legislature eliminated the provision increasing the base rate to sixty cents per ton and made permanent the 1988 base rate of thirty-six cents. Ch. 55, sec. 3, § 39–29–106, 1994 Colo. Sess. Laws, 334, 334–35.

ments to the rate of tax based upon changes in the index of producers' prices from the level of such index as of January, 1978, to the level of such index as of the last month of the quarter immediately preceding the quarter for which any taxes are due.

§ 39–29–106 (emphasis added).

At the time Colorado voters adopted Amendment 1 in 1992, the Department was collecting a tax of $0.54 per ton of extracted coal pursuant to the statute. After passage of the amendment, the Department's then-Executive Director issued a memo halting "further increases or upward revisions" of the coal severance tax rate "until further notice." The Department took no formal steps until 2006 to resolve the issue of how or whether Amendment 1 affected the implementation of section 39–29–106. The tax remained at $0.54 per ton for nearly fifteen years.

In 2006, the State Auditor's office conducted a review of the Department's activities related to determining and collecting all severance taxes owed to the State. The Auditor questioned the Department's failure to collect coal severance taxes as required by section 39–29–106, and the Department sought guidance on the matter from the Attorney General's office. In response, the Attorney General issued Formal Opinion No. 07–01 in July 2007. This opinion concluded that the tax rate set forth by section 39–29–106:(1)

predated Amendment 1, (2) requires non-discretionary adjustments to the tax owed based on a pre-set statutory formula, and (3) is a mandatory directive to the Department from the General Assembly. The Attorney General opined that the statute necessarily contemplated fluctuations in the tax rate and did not constitute a "new tax, tax rate increase, or ... tax policy change directly causing a net tax revenue gain" requiring advance statewide voter approval. In the words of the Attorney General,

> To require a vote each time the statutory formula requires an upward adjustment would be to render the statute a nullity.
>
> . . . .
>
> ... Going forward, the Department should apply the plain language of the statute and calculate the current coal tax rate using the increase or decrease in the index of producers' prices based on the level of the index as of January, 1978.

Following the Attorney General's opinion, the Department issued a notice of proposed rulemaking that resulted in a rule that tracks the language of the statute.[4] The Department then calculated a tax of $0.76 per ton of coal extracted, and Colorado Mining filed its action to prohibit the adjustment in the absence of statewide voter approval.

Finding no issues of material fact to be tried, the trial court, on cross-motions for summary judgment, ruled that the Depart-

---

4. The rule provides:

  (1) In addition to all other taxes, there is levied a tax upon the severance of coal from the earth within this state. The tax on coal is subject to an exemption of the first 300,-000 tons per calendar quarter, which need not be pro-rated for taxable periods of less than a calendar quarter. This exemption is allowed for each person, which shall be considered to be any combined unitary economic interest consisting of one or more related operations that are supportive of, or dependent upon, each other for the production of coal. Such person shall be liable for the payment of the tax imposed.

  (2) Exemptions.

  (a) There is allowed a credit equal to fifty percent of the severance tax on production of lignitic coal.

  (b) There is allowed a credit equal to fifty percent of the severance tax on production of underground coal.

  (3) The rate of tax on coal shall be determined as follows:

  (a) The basic rate shall be 36c per ton of coal.

  (b) The rate shall be adjusted each quarter based upon changes in the Producer's Price Index—All Commodities, (not seasonally adjusted) prepared by the U.S. Department of Labor, Bureau of Labor Statistics. Revisions to the Producer's Price Index shall not result in a further adjustment to the coal tax rate for a given quarter.

  (c) The adjustment shall be one percent of the basic rate for every full one and one-half percent change in the Producer's Price Index over the base period of January 1978. The tax rate for any quarter shall be the tax rate computed for the last month of the preceding quarter.

1 Colo.Code Regs. § 201–10, Regulation 39–29–106 (2007).

ment had a non-discretionary pre–Amendment 1 duty to implement the statute. It determined that this pre-existing taxing mechanism does not conflict with Amendment 1, which applies only to the adoption or imposition of new taxes, tax rate increases, or tax policy changes that cause net tax revenue gains. The trial court said:

> In sum, because the formula in § 39–29–106 continues to operate as established pre-[Amendment 1], and because any adjustments are triggered by external events and not discretionary government action, the operation of the statute (and Regulation 39–29–106) does not constitute a "tax rate increase" requiring voter approval under [Amendment 1].

The court of appeals reversed. It reasoned that because the implementation of the 1988 formula caused the amount of severance tax due to rise, voter approval must be obtained before the tax can be collected. *Huber*, 240 P.3d at 454–55. We disagree.

## II.

We hold that section 39–29–106(1) and (5) establishes a tax rate with two components: a base rate of "thirty-six cents per ton of coal" plus the non-discretionary adjustment factor that is "based upon changes in the index of producers' prices." The Department's implementation of section 39–29–106 is not a "tax rate increase," but a non-discretionary duty required by a pre–Amendment 1 taxing statute which does not require voter approval.

### A.

#### Standard of Review

A trial court may enter summary judgment when there is no disputed issue of material fact and the moving party is entitled to judgment as a matter of law. *McIntyre v. Bd. of Cnty. Comm'rs*, 86 P.3d 402, 406 (Colo. 2004). We review de novo a trial court's grant of summary judgment. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 71 (Colo. 2004).

In construing a statute, we strive to give effect to the intent of the legislature and adopt the construction that best carries out the provisions and purposes of the act. *Thomas v. F.D.I.C.*, 255 P.3d 1073, 1077 (Colo.2011); *Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo.2005). We first look to the language of the statute to determine the legislature's intent. *Thomas*, 255 P.3d at 1077. In construing a constitutional amendment, our goal is to determine and give effect to the will of the people in adopting the measure. *Bruce v. City of Colo. Springs*, 129 P.3d 988, 992–93 (Colo.2006). We use the general rules of statutory construction in construing citizen-initiated measures. *Id.* at 993. We avoid interpretations that lead to unjust, absurd, or unreasonable results. *Bickel*, 885 P.2d at 229 (Colo.1994).

We presume legislative enactments, whether by the General Assembly or the electorate through initiative or referendum, to be constitutional. Overcoming this presumption requires a showing of unconstitutionality beyond reasonable doubt. *Barber*, 196 P.3d at 247. Such a high burden acknowledges that declaring a statute or a constitutional amendment to be unconstitutional is one of the gravest duties impressed upon the courts. *Mesa Cnty. Bd. of Cnty. Comm'rs v. State*, 203 P.3d 519, 527 (Colo. 2009); *City of Greenwood Vill. v. Petitioners for the Proposed City of Centennial*, 3 P.3d 427, 440 (Colo.2000); *cf. Evans v. Romer*, 854 P.2d 1270, 1286 (Colo.1993) (holding a state constitutional amendment invalid under the federal Constitution). Our presumption of a statute's constitutionality is based on the deference we must afford the legislature in its law making duties. *Mesa Cnty. Bd. of Comm'rs*, 203 P.3d at 527.

As with any potential conflict between legislative provisions, we endeavor to give effect to the language and intent of both if possible; if two constructions are possible-one constitutional, the other unconstitutional-we choose the construction that avoids reaching the constitutional issue. *Colo. Dep't of Labor & Emp't v. Esser*, 30 P.3d 189, 194 (Colo.2001). Unless the terms of a constitutional amendment clearly show the intent that it be applied retroactively, we presume the amendment has prospective application only. *Jackson v. State*, 966 P.2d 1046, 1052

(Colo.1998); *In re Interrogatories on Great Outdoors Colo. Trust Fund,* 913 P.2d 533, 539 (Colo.1996); *Bolt v. Arapahoe Cnty. Sch. Dist. No. Six,* 898 P.2d 525, 533 (Colo.1995).

## B.

## Amendment 1 is Prospective in Application

The Colorado General Assembly has plenary discretionary authority to levy, assess, and collect taxes. Colo. Const. art. III; Colo. Const. art. V, § 31; Colo. Const. art. X, § 2; *Gates Rubber Co. v. S. Suburban Metro. Recreation & Park Dist.,* 183 Colo. 222, 227, 516 P.2d 436, 438 (1973) ("[T]axation is indisputably a legislative prerogative."); *Stanley v. Little Pittsburg Mining Co.,* 6 Colo. 415, 416 (1882) ("The authority of the legislature, under the constitution, to impose a tax upon the annual net proceeds of mines and mining claims bearing precious metals, and to make provision for the assessment and collection thereof, is not questioned.").

██ The Department is the agency generally assigned the duty of administering and enforcing tax laws that have statewide effect. Under section 39–21–112, the Department has a ministerial, non-discretionary duty to administer taxing statutes in accordance with the directives of the General Assembly. *See Am. Bonding Co. of Balt. v. People,* 53 Colo. 512, 526, 127 P. 941, 946–47 (1912) (ministerial officers "have no right to refuse to perform ministerial duties prescribed by law because of any apprehension on their part that ... the statute prescribing such duties may be unconstitutional"). To that end, the Department must implement tax statutes and promulgate regulations that do not conflict with statutory directives. *See* §§ 39–21–112(1), 39–29–106; *Miller Int'l, Inc. v. State Dep't of Revenue,* 646 P.2d 341, 344 (Colo. 1982) ("[A] regulation must further the will of the legislature and may not modify or contravene an existing statute. Thus, any regulation which is inconsistent with or contrary to a statute is void and of no effect." (citations omitted)).

██ Because the Department implements regulations to carry out the will and policy of the legislature expressed through tax stat-

utes, it has no power to impose a new tax or to set tax policy. *See Cohen v. State Dep't of Revenue,* 197 Colo. 385, 390, 593 P.2d 957, 961 (1979); *Weed v. Occhiato,* 175 Colo. 509, 511, 488 P.2d 877, 879 (1971) ("If a change in the law is desired, it must be accomplished by the General Assembly, for neither the Director of Revenue nor this Court is empowered with taxing authority.").

██ Exercise of the General Assembly's discretionary taxing power is subject to limits prescribed by the Colorado Constitution. *Parsons v. People,* 32 Colo. 221, 235, 76 P. 666, 670 (1904) ("[E]xcept as inhibited by the Constitution, the legislative department of government has the unlimited power of taxation, not only as to the subjects of taxation, but also as to the rate."). Section 4(a) of Amendment 1 is one such limit.

Section 4(a) requires a governmental entity to have voter approval in advance for "any new tax, tax rate increase, ... or a tax policy change directly causing a net tax revenue gain." Colo. Const. art. X, § 20(4)(a). This provision provides for the electorate's check upon adoption of new tax legislation before it can go into effect. *Bickel,* 885 P.2d at 226 ("Amendment 1's requirement of electoral approval is not a *grant* of new powers or rights to the people, but is more properly viewed as a *limitation* on the power of the people's elected representatives.").

██ Amendment 1 is contained within the constitutional provisions of article X relating to the General Assembly's taxing powers. Its purpose is to "protect citizens from unwarranted tax increases" and to allow citizens to approve or disapprove the imposition of new tax burdens. *In re Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d 1, 4 (Colo.1993). Amendment 1 did not repeal pre-existing tax statutes that include a tax rate provision for adjusting the amount of tax due. Instead, anticipating that pre-existing tax statutes might operate to bring in increasing amounts of revenue, Amendment 1 included article X, section 20(7), which imposes spending limits that require a refund of taxes collected unless retention of the excess revenue is voter-approved. *F.T. Havens v. Bd. of Cnty. Comm'rs,* 924 P.2d

517, 522 (Colo.1996). Accordingly, the voter-approval requirements of section 4(a) apply only to new taxes, tax rate increases, and tax policy changes adopted by legislative bodies after November 4, 1992. *See Bolt*, 898 P.2d at 533–34 (examining the specific language of Amendment 1 and holding that the electorate intended a prospective application beginning November 4, 1992). Thus, Amendment 1 did not change the types or kinds of taxing statutes allowable under our constitution.[5] Rather, it altered who ultimately must approve imposition of new taxes, tax rate increases, and tax policy changes by requiring voter approval before they can go into effect, leaving in place previously enacted legislative measures unless superseded by Amendment 1's provisions. *See Bickel*, 885 P.2d at 226; *In re Interrogatories on Senate Bill 93–74*, 852 P.2d at 4.

In *Bolt*, a school district exercised its authority to increase two mill levy rates and add a third to the total mill levied on property in the district. 898 P.2d at 527–30. The increase was approved by the District before Amendment 1, but the board of county commissioners issued its order approving the increase in 1993, after passage of Amendment 1. *Id.* Although the increase became effective after the passage of Amendment 1 and was not voted on by the district's electors, we held that implementing the increase did not violate Amendment 1. *Id.* at 537 ("We find that the [tax] is not subject to the voter-approval provision of [section 4(a)] because the [tax] was effectively imposed prior to the effective date of that provision."). Further, we held that the commissioners' post-Amendment 1 order to implement the mill levy increase was a "purely ministerial act" because the board of commissioners had "no authority to modify the school district's mill levy or to refuse to impose it." *Id.* at 538.

Our holding in *Bolt* is consistent with previous enunciations of Amendment 1's language, intent, and purpose. In *Campbell v. Orchard Mesa Irrigation District*, we held that "Amendment 1's objective is to prevent governmental entities from *enacting* taxing and spending increases above Amendment 1's limits without voter approval." 972 P.2d 1037, 1039 (Colo.1998) (emphasis added). Similarly, we have held that Amendment 1's prospective effect is intended "to limit the discretion of government officials to take certain taxing, revenue and spending actions in the absence of voter approval." *Havens*, 924 P.2d at 522 (emphasis omitted). Thus, we construe section (4)(a) of Amendment 1 as vesting with the voters the authority to approve or disapprove actions of legislative bodies that enact new taxes, tax rate increases or tax policy changes directly causing a net tax revenue gain. *In re Interrogatories on Senate Bill 93–74*, 852 P.2d at 4. The ministerial, non-discretionary implementation of a tax law passed in the exercise of legislative authority prior to November 4, 1992 does not require voter approval, even if such implementation occurs after Amendment 1's effective date of November 4, 1992. *Bolt*, 898 P.2d at 533–34.

## C.

### Application to this Case

■ Enacted in 1988, section 39–29–106 establishes a tax rate with two components for calculating the tax due per ton of coal extracted: a base tax rate and an adjustment factor to track inflation. This statute directs the Department to collect increased or decreased amounts whenever the PPI fluctuates by a full one and one-half percent. § 39–29–106(5). Implementation of the two-part tax rate formula to calculate the severance tax due is not a tax rate increase, but a ministerial function required of the Department. *Id.* ("The executive director *shall* determine such adjustments to the rate of tax based upon changes in the index." (emphasis added)). The statute leaves no room for a discretionary decision by the Department. Regulations promulgated by the Department to implement and collect the severance tax, such as the regulation challenged in this suit, must follow the statutory criteria for adjustment of the tax due. *See Cohen*, 197 Colo. at

---

5. A notable exception is found in section (6) of Amendment 1. Section (6) prohibits all "Emergency property taxes." No other limits on the types of taxes allowed were approved by voters in Amendment 1.

390, 593 P.2d at 961 ("A regulation may only carry into effect the will and policy established by the legislature and may not modify or contravene the existing statute.").

Because the limitations of Amendment 1 apply only to discretionary action taken by legislative bodies, the Department's implementation of the formula and collection of the tax does not require voter approval. Like the commissioners in *Bolt,* the Department has no tax making or tax policy change authority. It cannot modify the coal severance tax statutory mechanism or refuse to implement it. *See Bolt,* 898 P.2d at 538.

We recognize the difference between the mill levy in *Bolt* and the coal severance tax here: the mill levy tax was a onetime event which did not contain a mechanism to continuously adjust the tax amount due after November 4, 1992. However, we do not find this distinction meaningful. Like the tax at issue in *Bolt,* adjustments to the coal severance tax rate are a non-discretionary, ministerial duty of the Department, and involve no legislative or governmental act beyond that specified in the statute. The rule the Department adopted in 2007 following a fifteen-year hiatus in implementation of the statute merely parallels and enforces the statute.

■ We must adopt a construction that avoids or resolves potential conflicts, giving effect to all legislative acts, if possible. *See Havens,* 924 P.2d at 522; *Bolt,* 898 P.2d at 533; *Esser,* 30 P.3d at 194. Because it is prospective in application, Amendment 1's requirement of voter approval set forth in article X, section 20(4)(a) does not conflict with or supersede the coal severance tax provisions of section 39–29–106, which include a tax rate component that tracks inflation.

Colorado Mining argues that any increase in the amount of tax due resulting from the Department's implementation of section 39–29–106 is an event requiring the electorate's approval. But, the prospective limitations of Amendment 1 on the power to impose new taxes, tax rate increases or tax policy changes directly causing net revenue gains did not alter the Department's pre-existing administrative duty to enforce and implement the coal severance tax statute in accordance with its terms. The General Assembly adopted the tax rate for the coal severance tax in 1988, has not changed it since, and the Department has no power to do anything other than enforce it. The amount of tax due is simply a function of the statute's tax rate.[6]

The terms "tax" and "tax rate" contained in Amendment 1 are not specifically defined. Taxing statutes can take many forms. They can include a formula for periodically adjusting the amount of tax due. One definition of "tax rate" is "[a] mathematical figure for calculating a tax, usu[ally] expressed as a percentage." *Black's Law Dictionary* 1601 (9th ed. 2009). A tax rate can be expressed as a fixed numerical amount, a fixed percentage, or a mathematical formula with pre-set objective components for calculating the amount of tax due. Section 39–29–106 takes the form of the latter.

Colorado's severance tax statutes on extracted mineral resources include each of these three possible incarnations of a "tax rate." For example, the tax rate on all metallic minerals mined in the state takes the form of a fixed percentage: 2.25 percent of the extractor's gross revenue for revenue exceeding $19,000,000. § 39–29–103. The tax on severed molybdenum ore is a fixed numerical amount: five cents per ton of ore

---

**6.** The court of appeals' opinion turns on what it describes as a "simple syllogism:"

(1) [Amendment 1] prohibits increasing tax rates without voter approval.

(2) Applying the statutory formula increased the coal severance tax rate (initially from $0.54 to $0.76 per ton) without voter approval.

(3) Therefore, [Amendment 1] was violated. *Huber,* 240 P.3d at 454–55.

However, this syllogism fallaciously assumes that the adjustment formula in section 39–29–

106(5) is not part of the tax rate. The court of appeals erroneously construed Amendment 1 to invalidate the collection of an increased amount of coal severance tax due even though the two-part pre–Amendment 1 tax rate remained the same. The collection of increased revenue amounts is addressed by the spending limit and refund provisions of subsection (7) of article X, section 20, not the voter approval requirement in subsection (4)(a). *See Barber,* 196 P.3d at 247.

mined, excepting the first 625,000 tons mined per quarter. § 39–29–104.

In addition, several of Colorado's tax statutes include rates expressed as formulas providing for the amount of tax due to fluctuate in response to economic conditions or other external factors. Absent a new amendment by the General Assembly, the statute's tax rate mechanism remains the same. For example, the unemployment insurance tax statute includes a tax rate adjustment formula. § 8–76–102 to –103. The taxes owed per employee may increase from year to year based on statutory criteria. Similarly, oil shale severance is taxed at one percent of gross proceeds in year one of a commercial facility's production, two percent in year two, three percent in year three, and four percent thereafter. § 39–29–107. The preset tax rate formula thus requires increases in the tax due on severed oil shale by one percent each year with no room for discretionary action by the Department. *Id.*

Construing section 39–29–106 as written, we find that the General Assembly established a tax rate for extracted coal that is a function of two components. Section (1) sets a base amount of thirty-six cents per ton of extracted coal. § 39–29–106(1). Section (5) of the statute provides that the amount of the tax shall be adjusted based upon changes to the PPI. § 39–29–106(5). Giving effect to every provision of this statute requires the Department to collect the base rate plus the one percent adjustment factor that the General Assembly tied to the PPI. *See Cohen,* 197 Colo. at 390, 593 P.2d at 961 (holding that an administrative agency may not modify or contravene existing statutes in carrying out its ministerial duties).

The Department's duties are plainly nondiscretionary under the statute. The Department has no taxing or tax policy-making authority. Section 39–29–106(5) provides that the Director *"shall* determine" adjustments according to the adjustment formula. § 39–29–106(5) (emphasis added); *see Pearson v. Dist. Ct.* 924 P.2d 512, 516 (Colo.1996) (generally accepted and familiar meaning of "shall" indicates that this statutory term prescribes a mandatory duty); *Am. Bonding of Balt.,* 53 Colo. at 526, 127 P. at 946–47.

For fifteen years, the Department failed to enforce its legislative mandate to apply the formula and collect the tax due. The Department's correction of this incorrect practice occurred after a deliberate analysis undertaken through a state audit, an Attorney General's opinion, and a rulemaking proceeding affording Colorado Mining and other interested persons the opportunity for public comment. Each of these steps resulted in the conclusion that Amendment 1 does not require the Department to obtain voter approval each time it adjusts the amount of coal severance tax due applying section 39–29–106 as written. We agree that this construction of the law is correct.

### III.

Accordingly, we reverse the judgment of the court of appeals and reinstate the trial court's judgment.

Justice COATS dissents, and Justice EID joins in the dissent.

Justice MÁRQUEZ does not participate.

Justice COATS, dissenting.

Unlike the majority, I believe that in the absence of voter approval the Taxpayer Bill of Rights Amendment to the Colorado Constitution bars the continuous tax rate increases mandated by section 39–29–106 of the revised statutes, and I therefore respectfully dissent. Because I also believe the majority fundamentally misconstrues the problem posed by the continued enforcement of such a statute, I write separately to briefly outline my views.

There can really be no question that TABOR bars increases in tax rates without advance voter approval or that changing the rate at which extracted coal is taxed from fifty-four cents per ton to seventy-six cents per ton is a tax rate increase. The term "rate" standing alone could of course be understood to apply to virtually any price or value, as in the going "rate" for something, but more typically it describes a ratio or relation between two things, like a charge, payment, or price fixed according to a ratio, scale, or standard. *See generally* Webster's

Third International Dictionary 1884 (1976). In the context of taxes, it generally refers to a unit charge or ratio used by the government in assessing taxes. *Id.* In this case, however, there is little need or room to parse the fine points and variations of the term's meaning because the statute itself indicates what it means by the "tax rate." Subsection 39–29–106(1) sets the initial "rate of the tax" at "thirty-six cents per ton of coal" and subsection 39–29–106(5) mandates that "the *tax rate* provided in subsection (1) of this section shall be *increased* or decreased" at specified intervals to account for "change[s] in the index of producers' prices for all commodities prepared by the bureau of labor." (emphasis added). The "tax rate" on extracted coal, as determined by the legislature itself, is therefore clearly the dollar amount per ton of coal for which each taxpayer is liable.

It simply strains credulity beyond the breaking point to assert, as does the majority, that raising the tax on every ton of extracted coal from fifty-four to seventy-six cents is not a tax rate increase, and instead that the tax rate contemplated by TABOR is the broader legislative prescription requiring periodic increases, in perpetuity, in the dollar amount assessed per ton of coal. As best I can understand it, the majority reasons that the department lacks the authority to increase the tax rate and therefore "the amount of the tax" is merely "adjusted" by the department according to the legislature's prescription; that the mechanism or formula for periodic increases is actually the "tax rate" to which TABOR refers; and that the limitations of TABOR do not apply to this statutory mechanism, or tax rate, at all because TABOR applies only prospectively and section 39–29–106 was enacted before TABOR became effective. Therefore, it concludes, unless the statute exceeds the constitutional authority of the legislature, the department is entitled, and in fact obligated, to continue to make upward adjustments in tax liability per ton of coal.

While many of the propositions of law advanced by the majority in support of this syllogism are not in themselves wrong, I consider them largely red herrings, which in no way resolve the legality of taxing extracted coal at more than the fifty-four cents per ton tax rate in existence on the date after which TABOR requires voter approval. There has never been the remotest suggestion that TABOR applies retroactively to tax rate increases occurring before its adoption, and clearly no such rate increase is at issue in this case. The only increases at issue are increases over and above the tax rate in existence at the time TABOR was approved. And while I consider the majority's strenuous attempt to distinguish the "imposition" of a tax from its "implementation" as bordering on the hyper-technical, I fully agree that the department lacks the authority to alter the tax rate on extracted coal except as permitted by statute and that no statute purports to grant the department discretion in that regard. I strongly disagree, however, with any suggestion that the department is authorized, much less obligated, to continue to implement the tax rate increases prescribed by section 39–29–106 until that statute is proven beyond a reasonable doubt to have been unconstitutionally enacted. Instead, I believe the authority of the department, at least to the extent of fixing the tax due on extracted coal at more than fifty-four cents per ton without voter approval, turns on whether the statute granting it that authority was superseded, or repealed, by constitutional amendment.

Although repeal by implication is disfavored as a matter of statutory construction, *Chism v. People,* 80 P.3d 293, 295 (Colo. 2003), even in the statutory context an earlier statute is held to be implicitly repealed by a later statute evidencing a clear and manifest intent to do so, *People v. Burke,* 185 Colo. 19, 521 P.2d 783 (1974). Similarly, we have found existing statutes to continue in force subsequent to the adoption of an amendment to the state constitution *unless* they are inconsistent with that constitutional amendment. *See, e.g., People ex rel. Union Trust Co. v. Superior Court,* 175 Colo. 391, 488 P.2d 66 (1971). The general proposition that prohibitive and restrictive provisions in a constitutional amendment are self-executing and all statutes then existing or which may thereafter be passed inconsistent with such provisions are null and void, is too well-

established to merit discussion. *See Ladd & Tilton Bank v. Frawley, Cnty. Treasurer*, 98 Or. 241, 193 P. 916 (1920) (citing authorities); *see also Oakland Paving Co. v. Hilton*, 69 Cal. 479, 11 P. 3 (1886) (although prospective, constitutional amendment annulled any statute then in force or which might thereafter be passed inconsistent with its provisions); *cf. United States v. Chambers*, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934) (National Prohibition Act not repealed by Congress but rendered inoperative by Twenty–First Amendment).

Not only is TABOR a constitutional provision to which legislative acts are subservient, rather than merely another statute itself, but its intent to limit the legislative taxing power by subjecting it directly to popular approval, *see Bickel v. City of Boulder*, 885 P.2d 215, 226 (Colo.1994), and to "supersede" all conflicting state statutes could not be more clear, *see* Colo. Const. Art. X, sec. 20(1) ("All provisions are self-executing and severable and supersede conflicting state constitutional, state statutory, charter, or other state or local provisions."). Starting November 4, 1992, the state is expressly required to have voter approval in advance for any tax rate increase that does not fall within a TABOR exception. Colo. Const. Art. X, sec. 20(4)(a). The language of TABOR simply does not admit of any construction permitting future tax rate increases without the constitutionally required voter approval, whether or not they were mandated by statutes enacted before the constitutional amendment, and this court has never suggested otherwise.

While the majority appears to acknowledge that TABOR certainly could supersede previously enacted legislative measures, *see* maj. op. at 891, it concludes that TABOR "did not repeal pre-existing statutes that include a tax rate provision for adjusting the amount of tax due." Id. at 891. Rather than all tax rate increases actually imposed after November 4, 1992, the majority broadly concludes that "the voter-approval requirements of section 4(a) *apply only* to new taxes, tax rate increases, and tax policy changes *adopted* by legislative bodies after November 4, 1992." Id. at 891 (emphasis added). For this proposition, the majority relies largely

on two prior decisions of this court, which do not even address, much less support, the majority's proposition.

The majority relies on *Bickel v. City of Boulder*, 885 P.2d at 226, for the proposition that TABOR provides a check only on the adoption of *new* tax legislation before it can go into effect. Maj. op. at 890. *Bickel*, however, did not speak to the question of new versus pre-existing tax legislation at all and, in fact, stands for virtually the opposite proposition. Rather than creating a new fundamental right in the citizens of the state, we held in *Bickel* that TABOR was intended as a "limitation on the power of the legislature." 885 P.2d at 226.

Similarly, in *Bolt v. Arapahoe County School District No. Six*, 898 P.2d 525 (Colo. 1995), we in no way suggested that an existing statute prescribing tax rate increases to take effect periodically after November 4, 1992 does not conflict with TABOR simply because the implementing body lacks discretion in the matter. Rather, we held only that the mill levy at issue in that case was not subject to the voter-approval requirements of TABOR because it had actually been imposed and was already in existence prior to the adoption of TABOR. Largely because any further action required of the County Commissioners would be ministerial in nature, we found that the new mill levy was effectively imposed when the Board of Education adopted a budget including expenditures to be funded by it. Although even that holding was not beyond dispute, *see id.* at 540–42 (Scott, J., concurring in part and dissenting in part), it did not involve tax rate increases or the enactment of legislation at all, much less imply that a future tax rate increase must be considered to have been imposed for purposes of TABOR when the legislation mandating it was enacted.

In *Bolt* we therefore found that a mill levy already in existence on November 4, 1992 could not be a "mill levy above that for the prior year," within the contemplation of TABOR. *Id.* at 540. Not even the state suggests that a tax rate of seventy-six cents per ton was in existence on November 4, 1992. That tax rate clearly represents an increase over the rate of fifty-four cents per ton in

effect on November 4, 1992, the date after which TABOR mandates voter approval for tax rate increases. While the holding of *Bolt* might arguably be extended to sanction a tax rate increase legislatively mandated to take effect before November 4, 1992, even though calculating the actual amount of the tax required some further ministerial action, it cannot support the proposition that statutes mandating future tax rate increases without approval are not in conflict with TABOR.

The only textual argument advanced by the majority for the proposition that TABOR applies "only to new taxes, tax rate increases, and tax policy changes adopted by legislative bodies after November 4, 1992," maj. op. at 891, is that TABOR's separate provision for the refund, in the absence of voter approval to do otherwise, of revenue from sources not excluded from fiscal year spending that exceeds TABOR's spending limits necessarily contemplates that "pre-existing tax statutes might operate to bring in increasing amounts of revenue." *Id.* at 890. At the risk of exposing my own inability to follow this reasoning, I note only that TABOR purports to limit spending and revenue quite apart from requiring voter approval of tax rate increases, and there are many sources of revenue apart from tax rate increases. To the extent the majority intends that the purpose of TABOR is only to protect citizens from "unwarranted" tax increases and that future tax rate increases enacted prior to November 4, 1992 are not "unwarranted," it simply ignores the express limitations of the amendment. I am aware of nothing in either the language or history of the amendment that can be construed to create an exception for future tax rate increases merely because they were ordered by legislative enactment occurring before TABOR was approved.

I fail to understand how statutes like section 39–29–106, prescribing periodic upward adjustments to existing tax rates, can be understood as anything other than a direct conflict with TABOR's mandate that starting November 4, 1992, the state must have voter approval in advance for any tax rate increase. Were it not sufficiently clear from general principles of constitutional construction alone, TABOR expressly indicates that it is self-executing and supersedes any conflicting provisions of state statutes. At least to my mind, there is simply no room to hold that section 39–29–106 continues to authorize the department to periodically increase, as it has done, the tax rate on extracted coal beyond the fifty-four cents per ton being levied on November 4, 1992.

I therefore respectfully dissent.

I am authorized to state that Justice EID joins in this dissent.