Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2019 CO 79**

**No. 17SC368, *Griswold v. Nat'l Fed'n of Indep. Bus.* — Taxpayer's Bill of Rights — Summary Judgment.**

The supreme court considers the constitutionality of section 24-21-104, C.R.S. (2019), which outlines the funding mechanism for the Colorado Department of State. Under this statute, the Department is directed to charge for its services and then use the collected funds to finance the Department's activities. The National Federation of Independent Business ("NFIB") contends that the Department's charges are taxes; thus, the Taxpayer's Bill of Rights ("TABOR") applies, and any adjustments to the charges after TABOR's enactment in 1992 constitute either new taxes, tax rate increases, or tax policy changes directly causing a net revenue gain, all of which require advance voter approval. Because voters have not approved these adjustments, NFIB asserts that this funding scheme violates TABOR.

The supreme court concludes that the trial court properly granted the petitioners' motion for summary judgment. Based on the record presented, there

was no evidence that any post-TABOR adjustment resulted in a new tax, tax rate increase, or tax policy change directly causing a net revenue gain. Consequently, the supreme court does not address whether the charges authorized by section 24-21-104 are taxes subject to TABOR.

The supreme court reverses the judgment of the court of appeals, reinstates the trial court's summary judgment order in favor of the petitioners, and remands for further proceedings consistent with this opinion.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

## 2019 CO 79

---

### Supreme Court Case No. 17SC368
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA2017

---

### Petitioners/Cross-Respondents:

Jena Griswold, in her official capacity as Secretary of State; Colorado Department of State; and State of Colorado,

v.

### Respondent/Cross-Petitioner:

National Federation of Independent Business.

---

### Judgment Reversed
*en banc*
September 23, 2019

---

**Attorneys for Petitioners/Cross-Respondents:**
Phillip J. Weiser, Attorney General
Grant T. Sullivan, Assistant Solicitor General
Emily Buckley, Assistant Attorney General
　　　*Denver, Colorado*

**Attorneys for Respondent/Cross-Petitioner:**
Brownstein Hyatt Farber Schreck, LLP
Christopher O. Murray
Van Aaron Hughes
Emily R. Garnett
　　　*Denver, Colorado*

**Attorneys for Amici Curiae City and County of Denver and the Colorado Municipal League:**
City and County of Denver
Kristin M. Bronson, Denver City Attorney
David W. Broadwell
    *Denver, Colorado*

**Attorneys for Amici Curiae Pacific Legal Foundation, Goldwater Institute, TABOR Foundation, and Colorado Union of Taxpayers Foundation:**
Pacific Legal Foundation
James M. Manley
    *Phoenix, Arizona*

Pacific Legal Foundation
Jeffrey W. McCoy
    *Sacramento, California*

**JUSTICE HOOD** delivered the Opinion of the Court.

¶1     This case provides us another opportunity to examine the implications of the Taxpayer's Bill of Rights ("TABOR"). At issue now is how Colorado's Department of State ("the Department") charges for some of its services—for example licensing businesses—to then fund its general operations, which include overseeing elections. It is this funding scheme that the National Federation of Independent Business ("NFIB") argues is unconstitutional under TABOR.

¶2     TABOR requires advance voter approval for any new tax, tax rate increase, or tax policy change directly causing a net tax revenue gain to any district. It applies prospectively. Therefore, to establish that a charge violates TABOR, NFIB must show: (1) that the charge is a tax; and (2) that the charge post-TABOR constituted a new tax, tax rate increase, or tax policy change.

¶3     Through this TABOR lens, we examine the statute in question. Section 24-21-104(3)(b), C.R.S. (2019), directs the Department to "adjust its fees so that the revenue generated from the fees approximates [the Department's] direct and indirect costs." This fluctuating scheme for self-funding has been in place for nearly thirty years. So, the scheme predates TABOR by nearly a decade, but there have been adjustments to charges since TABOR's enactment.

¶4     NFIB contends that these adjustments violate TABOR. First, NFIB argues that the charges are really taxes because there is no reasonable relationship between the Department's charges and the government functions funded by the

3

charges. Second, NFIB asserts that any increase in the charges after TABOR's enactment in 1992 constitutes either a new tax, an increase in a tax rate, or a tax policy change—all requiring voter approval, which has never occurred.

¶5 Because we disagree with NFIB's second contention, we need not address its first. Based on the stipulated facts, we conclude that there was no evidence to establish that any post-TABOR adjustments resulted in a new tax, tax rate increase, or tax policy change directly causing a net revenue gain. Thus, the trial court properly granted summary judgment. Consequently, we need not, and therefore do not, reach the issue of whether the charges authorized by section 24-21-104 are taxes under TABOR.

## I. Facts and Procedural History

### A. The Department and Section 24-21-104

¶6 Almost since statehood, the Department has been responsible for many of the most vital administrative functions of the government, including registering and licensing businesses. For over fifty years, the Department has also been responsible for overseeing state elections. Ch. 334, sec. 2, § 49-1-11, 1967 Colo. Sess. Laws 687, 687.

¶7 Since the Department's inception, the Secretary of State ("the Secretary") has collected charges for its services. *See* Ch. 34, 1877 Colo. Gen. Laws 425, 427. In 1877, the General Assembly directed the Secretary to collect "fees" for military

4

commissions, notary public commissions, foreign commissions, any other commission or appointment to which the state seal would be affixed, official certificates, filing and recording certificates of incorporation, and for any copies or transcripts of papers and records. *Id.* The General Assembly also set the amount the Secretary would charge and collect for these services. *See id.* ("For each military commission, two dollars and fifty cents; for each notary public's commission, five dollars . . . ."). The Secretary would then transfer the charges to the state treasurer on a monthly basis. *Id.*

¶8 In the 1980s, the General Assembly began tinkering with the Department's funding scheme. *See, e.g.,* Ch. 76, sec. 7, § 24-21-104, 1981 Colo. Sess. Laws 429, 430–31. Though the General Assembly continued to set the amount of the Department's charges, it directed the Department to "propose, as part of its annual budget request, an adjustment in the amount of each fee which the secretary . . . is authorized . . . to collect." *Id.* at 431. The General Assembly also specified that the budget request should "reflect [the] direct and indirect costs" of the Department. *Id.*

¶9 In 1983, the General Assembly settled on a funding mechanism for the Department—the same mechanism in effect today. Ch. 256, sec. 1, § 24-21-104, 1983 Colo. Sess. Laws 861, 861–62; *see also* § 24-21-104(3). As part of the 1983 amendments, the General Assembly jettisoned the set list of charges and directed

the Department to "adjust its fees . . . so that the revenue generated from said fees approximates its direct and indirect costs." *See* 1983 Colo. Sess. Laws at 861–62. The General Assembly also created the Department of State Cash Fund. *Id.* All collected charges must be credited to that fund and only used to finance the Department. *See id.*

¶10 So, as it stands now, the Secretary has the discretion to set, increase, decrease, or temporarily suspend the Department's charges without legislative oversight. *See* § 24-21-104(3)(b). That said, the Secretary cannot set these charges at whatever level she wishes—they must be adjusted "so that the revenue generated from the fees approximates [the Department's] direct and indirect costs." *See id.* But this is the only guiding principle included in the statute. There is no statutory formula, base rate, or adjustment factor to further constrain the Secretary.

## B. TABOR

¶11 In 1992, nine years after the legislature created the current funding scheme for the Department, Colorado voters adopted TABOR. *See* Colo. Const. art. X, § 20.

¶12 TABOR requires voter approval before the imposition of "any new tax, tax rate increase, . . . or . . . tax policy change directly causing a net tax revenue gain to any district." Colo. Const. art. X, § 20(4)(a). A charge is a "tax" if its "primary purpose is to raise revenue for general governmental use." *Colo. Union of Taxpayers*

6

*Found. v. City of Aspen*, 2018 CO 36, ¶ 26, 418 P.3d 506, 513.  It isn't a tax if it "is imposed as part of a comprehensive regulatory scheme, and if [its] primary purpose . . . is to defray the reasonable direct and indirect costs of providing a service or regulating an activity under that scheme."  *Id.*

¶13    TABOR "also limits the growth of state revenues, usually met by tax increases, by restricting the increase . . . unless voter approval for an increase in spending is obtained."  *In re Submission of Interrogatories on Senate Bill 93-74*, 852 P.2d 1, 4 (Colo. 1993) (citing Colo. Const. art. X, § 20(7)(a)).  "Its purpose is to 'protect citizens from unwarranted tax increases' and to allow citizens to approve or disapprove the imposition of new tax burdens."  *Huber v. Colo. Mining Ass'n*, 264 P.3d 884, 890 (Colo. 2011) (quoting *Senate Bill 93-74*, 852 P.2d at 4).

¶14    TABOR only applies prospectively to statutes imposing new taxes, tax rate increases, or tax policy changes enacted after November 4, 1992.  *See id.* at 891. However, a pre-TABOR statute can still violate TABOR if the statute constitutes a new tax, tax rate increase, or tax policy change resulting in a net revenue gain.  *See id.*

## C.  NFIB's Lawsuit

¶15    NFIB is a nonprofit corporation that represents the interests of small business owners nationwide.  The Colorado branch of NFIB filed this lawsuit against the Secretary, the Department, and the State of Colorado ("the

7

petitioners") in 2014, alleging that the Department's funding mechanism is unconstitutional. Specifically, NFIB contends that section 24-21-104 violates TABOR because: (1) the Department's charges are taxes and thus subject to TABOR's requirements; and (2) the post-TABOR adjustments to the charges and what they fund constitute new taxes, tax rate increases, or tax policy changes that were never approved by Colorado voters. NFIB also argues that these charges have harmed its members, who must pay business and licensing charges in order to file required corporate documents with the Secretary.

¶16 The petitioners filed a motion to dismiss, but later withdrew the motion after the parties agreed to file cross-motions for summary judgment. Rather than conduct formal discovery, the parties stipulated to what they deemed the relevant facts.

¶17 The trial court granted summary judgment in favor of the petitioners. Because the parties stipulated to all material facts, the court only addressed whether the funding scheme was unconstitutional. In doing so, it declined to determine whether the charges were taxes because it concluded the funding statute wasn't subject to TABOR at all. The trial court focused on whether the post-TABOR adjustments to the charges constituted an increase in a tax rate or a change in tax policy directly causing a net tax revenue gain. The trial court decided that periodic adjustments to the charges didn't constitute a change to the tax policy

8

or the "high level overall plan" of the funding mechanism, and that "the charges are part of a pre-set formula that is not a tax rate change and does not result in a net revenue gain to the State."

¶18 NFIB appealed the order granting the petitioners' motion for summary judgment, and a division of the court of appeals reversed and remanded for further development of the record. *Nat'l Fed'n of Indep. Bus. v. Williams*, No. 15CA2017, ¶ 1 (Mar. 2, 2017). Like the trial court, the division declined to address whether the charges were taxes and instead analyzed whether the post-TABOR adjustments to the charges implicated TABOR. *Id.* at ¶ 11. Unlike the trial court, however, the division declined to determine whether TABOR applied to the adjustments to the business and licensing charges, because "the present record [did] not allow [the division] to conclude, as a matter of law, whether TABOR applies here." *Id.* at ¶ 16. The division then concluded that there was a genuine issue of material fact to resolve and, therefore, the trial court erred in granting summary judgment. *Id.* at ¶ 17. The division thus remanded for further development of the record, specifically "to determine whether the Business and Licensing charges have been adjusted or increased since the passage of TABOR in 1992, such that voter approval was required for these adjustments or increases." *Id.* at ¶ 21.

9

¶19    Both the petitioners and NFIB filed petitions for certiorari, which we granted.[1]

## II. Analysis

¶20    After reviewing familiar authority governing summary judgment, we conclude that the division erred by mistaking the absence of evidence in the record to support NFIB's case for a genuine dispute of material fact.  We then consider whether any post-TABOR adjustments to the business and licensing charges authorized by section 24-21-104 constituted a new tax, tax rate increase, or tax policy change such that voter approval was required.  We conclude that there was insufficient evidence to establish as much.  Thus, we do not reach the issue of whether these charges are taxes.

---

[1] We granted certiorari to review the following issues:

1. [REFRAMED] Whether the court of appeals erred in finding that the existence of a disputed issue of material fact precluded summary judgment.

2. [REFRAMED] Whether the business and licensing exactions authorized by section 24-21-104 are fees or taxes within the contemplation of TABOR.

3. [REFRAMED] Whether the business and licensing exactions authorized by section 24-21-104 are dictated by a mechanism or formula that pre-dated TABOR, as to which TABOR therefore does not apply.

## A. The Division Erred in Remanding for Further Development of the Record

¶21 The parties agree that the division erred in remanding the case to the trial court for further development of the factual record. The petitioners contend that NFIB failed to satisfy its burden at the summary judgment stage of establishing that there was a material issue of fact, and it was error to remand and allow NFIB to have a second opportunity to conduct discovery. NFIB counters that the division erred because the parties' stipulated facts established that the Secretary's post-TABOR adjustments constituted new taxes, tax rate increases, or tax policy changes.

### 1. Standard of Review

¶22 We review a trial court's decision to grant or deny a motion for summary judgment de novo. *See State v. Medved*, 2019 CO 1, ¶ 13, 433 P.3d 33, 36. Therefore, we review de novo here.

### 2. Summary Judgment

¶23 Summary judgment is proper only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with [supporting and opposing] affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c). "The party moving for summary judgment may satisfy this burden by demonstrating that there is an absence of evidence in the record to support the

11

nonmoving party's case." *Civil Serv. Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo. 1991).

¶24    Once the moving party clears this initial evidentiary hurdle, the burden shifts to the nonmoving party to show a "triable issue of fact." *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 713 (Colo. 1987). "[T]he nonmoving party may not rest on mere allegations or demands in its pleadings but must provide specific facts demonstrating a genuine issue for trial." *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 27, 420 P.3d 223, 229. "In determining whether summary judgment is proper, the nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party." *Peterson v. Halsted*, 829 P.2d 373, 376 (Colo. 1992).

¶25    Here, the parties agreed to forego discovery, opting instead to stipulate to the facts. In their motions for summary judgment, both NFIB and the petitioners stated that there was no material dispute of fact. Nonetheless, the division concluded that the record failed to resolve whether the post-TABOR increase in revenues collected by the Department resulted from any government action, and thus it remanded for further development of the factual record. *Nat'l Fed'n of Indep. Bus.*, ¶ 21.

¶26 The division erred because it mistook the absence of evidence to support NFIB's case for a dispute of material fact. The moving party bears the initial burden of showing there is no genuine dispute of material fact. *See Cont'l Air Lines, Inc.*, 731 P.2d at 712. If the moving party carries that burden, then it's the nonmoving party's obligation to establish that there is a genuine dispute of material fact. *See id.* at 713. The nonmoving party's failure to demonstrate that there is evidence in the record of a genuine dispute of material fact will, more often than not, support granting the moving party's summary judgment motion. *See Pinder*, 812 P.2d at 649.[2]

¶27 Reviewing courts should not reverse a trial court's grant of summary judgment, and remand for further development of the record, when the moving party establishes an absence of evidence to support the nonmoving party's case and the nonmoving party fails to establish a genuine issue of material fact. *Cf. id.* ("An affirmative showing of specific facts, uncontradicted by any counter affidavits, leaves a trial court with no alternative but to conclude that no genuine

---

[2] This is not to say that this is always the case. Trial courts have discretion in granting or denying motions for summary judgment, particularly in circumstances where the facts are complex or the issue itself is novel, such that granting summary judgment may be premature. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2725 (4th ed. 2016).

issue of material fact exists."). This is especially true in situations such as this, where the parties stipulated to what they perceive to be the relevant facts and continue to insist that there is no genuine dispute of material fact. Consequently, the division erred here in remanding for additional development of the factual record.

¶28 On the record presented, then, we next consider whether TABOR applies to section 24-21-104.

## B. TABOR Doesn't Apply to the Adjustments

¶29 The petitioners urge us to conclude that the post-TABOR adjustments to the charges are not subject to TABOR's voter approval requirements because "government action implementing a preexisting funding statute complies with TABOR so long as the implementing agency refrains from exercising discretionary 'tax making or tax policy change' functions." NFIB argues that the business and licensing charges *are* "discretionary and non-ministerial" adjustments and that the stipulated facts establish that the post-TABOR adjustments constituted new taxes, tax rate increases, or tax policy changes. Because the petitioners established that there was an absence of evidence in the record to support NFIB's case, *see Pinder*, 812 P.2d at 649, and NFIB failed to carry its burden of establishing that there was a triable issue of fact, we conclude that the trial court correctly granted the petitioners' motion for summary judgment.

14

## 1. Standard of Review

¶30    "We review questions of constitutional and statutory interpretation de novo." *Campaign Integrity Watchdog v. All. for a Safe & Indep. Woodmen Hills*, 2018 CO 7, ¶ 19, 409 P.3d 357, 361.

## 2. New Tax, Tax Rate Increase, or Tax Policy Change?

¶31    TABOR was enacted to "limit the discretion of government[] officials to take certain taxing, revenue and spending actions in the absence of voter approval." *Havens v. Bd. of Cty. Comm'rs of Archuleta*, 924 P.2d 517, 522 (Colo. 1996) (emphasis omitted).  But TABOR doesn't apply to all taxing, revenue, and spending actions — because it is prospective, it only applies to any "new taxes," "tax rate increases," or "tax policy changes" directly causing a net revenue gain implemented after 1992.  *See Huber*, 264 P.3d at 890–92.

¶32    TABOR does not, however, define these key terms, nor have we.  *See TABOR Found. v. Reg'l Transp. Dist.*, 2018 CO 29, ¶ 21, 416 P.3d 101, 105 ("This court has never decided what constitutes a 'new tax' or a 'tax policy change' under TABOR section 4(a) . . . .").

¶33    But we have provided some guidance.  In *Huber*, for example, we suggested that there may not be one all-encompassing definition of either "tax" or "tax rate." 264 P.3d at 892 ("The terms 'tax' and 'tax rate' . . . are not specifically defined. Taxing statutes can take many forms.").  We noted that a taxing statute could

15

"include a formula for periodically adjusting the amount of tax due" or could provide "a fixed numerical amount, a fixed percentage, or a mathematical formula with [preset] objective components for calculating the amount of tax due." *Id.*

¶34 We recently clarified the meaning of the terms "new tax" and "tax policy change" in *TABOR Foundation*. While we didn't explicitly define either term, we looked closely at the language of both phrases and reasoned that both "include[] a word that implies more than mere change." *TABOR Found.*, ¶ 24, 416 P.3d at 106. And, we observed that a "tax policy change" "suggests a significant change." *Id.* We also examined the purpose of section 4 of TABOR—to "constrain[] tax hikes"—and concluded that "a legislative change causing only an incidental and de minimis revenue increase" was "*not* a 'new tax' or a 'tax policy change.'" *Id.* at ¶¶ 25–26, 416 P.3d at 106.

¶35 We've also considered the constitutionality of pre-TABOR statutes that authorized a taxing, revenue, or spending action after TABOR took effect. In *Nicholl v. E-470 Public Highway Authority*, 896 P.2d 859, 862–65 (Colo. 1995), we examined the constitutionality of a plan to remarket revenue bonds that were originally issued in 1986 to finance the construction of a highway. Because "[t]he bond remarketing scheme [did] not *create* any *new* obligation, it merely remarket[ed] debt that was authorized before the enactment of [TABOR] under

16

the terms of a financing plan adopted at the time the debt was issued," we reasoned TABOR did not apply to this financing scheme. *Id.* at 870–71.

¶36 Shortly after *Nicholl*, in *Bolt v. Arapahoe County School District Number Six*, 898 P.2d 525, 534 (Colo. 1995), we addressed whether a school district's pre-TABOR authorization for mill levy increases allowed the district to increase the levy without a vote even after TABOR (and its voter approval requirement) went into effect. We held that the increased mill levy didn't violate TABOR's voter approval requirement because it was a "purely ministerial act"—the district was merely implementing what it had been statutorily required to do. *Id.* at 538–39. The Board of County Commissioners, which was responsible for implementing the levy, had no discretion to alter the amount of the levy. *Id.* Thus, we allowed the levy increase without requiring voter approval because it was authorized by a pre-TABOR statute and its implementation was a purely ministerial, nondiscretionary function. *Id.*; *accord Huber*, 264 P.3d at 891–92 (applying this holding to determine that post-TABOR adjustments to Colorado's coal severance tax were likewise valid because the "adjustments to the coal severance tax rate [were] a non-discretionary, ministerial duty of the Department [of Revenue], and involve[d] no legislative or governmental act beyond that specified in the statute").

17

¶37 Two principles emerge from these cases: (1) A change resulting in an incidental and de minimis increase in government revenue is not a new tax or a tax policy change; and (2) ministerial, nondiscretionary adjustments to taxation schemes authorized by statutes enacted before TABOR remain valid, even without voter approval.

¶38 In applying these principles, we turn to the parties' stipulations concerning the post-TABOR adjustments:

- "From 1983 to the present, the Business and Licensing Charges have been authorized by statute, but have not been enumerated by statute."

- "[Section] 24-21-104 also requires the Secretary to set the Business and Licensing Charges so that the revenue generated from those Charges, along with the Department's charges for non-Business and Licensing-related services, approximates the Department's direct and indirect costs."

- "The Secretary has discretion to set, increase, decrease, and/or temporarily suspend the Department's various fees, including the Business and Licensing Charges, without legislative or other executive oversight."

- "There is no law that ties the Business and Licensing Charges to any pre-set statutory rate adjustment formula, base rate, adjustment factor, or inflation-adjusted index."

- "Between FY 1990-91 and FY 2013-14, the number of documents and reports filed with the Department increased by slightly more than fourfold."

- "Between FY 1990-91 ($4.19 million) and FY 2013-14 ($18.69 million), the amount of revenues credited to the Department increased by slightly more than fourfold."

18

- "The increase in the collected revenue from FY 2010-11 to FY 2013-14 is generally attributable to the significant increase in the total number of filings."

Thus, the parties agree that, since 1983, the Secretary has had authority to set the charges so that the revenue generated from these charges approximates the Department's direct and indirect costs. There is no formula beyond that statutorily mandated limit. The parties further agree that over nearly three decades, the number of filings increased slightly more than fourfold. And over that same time period, the amount of collected revenue also increased slightly more than fourfold.

¶39 But the stipulations don't reveal whether the amount of collected revenue increased because of the increased filings or because the Department increased the charges for individual filings. The record is silent on this point. The most we can glean from the stipulated facts is that the collected revenue increased throughout the same time period as the number of business filings in Colorado increased. And at least for the period between FY 2010–11 and FY 2013–14, the parties agreed that the increase in collected revenue was "generally attributable" to the increase in filings. Implicit in this stipulation is that, at least for those few years, the increase in collected revenue was not due to post-TABOR adjustments.

¶40 Here, any increase in governmental revenue resulting simply from an increase in filings would have been only incidental and de minimis because there is no evidence that the Secretary's adjustments to charges caused the revenue gain.

The adjustments may be "discretionary and non-ministerial," and thus potentially problematic under TABOR, but if NFIB can't show that they triggered the gain, there is no TABOR violation.

¶41 Even so, NFIB argues that the record contains evidence of "repeated increases and policy changes" to the Department's business and licensing charges. They point to three examples.

¶42 First, NFIB contends that the Department implemented a new tax or a new tax policy in 1996 (and again in 2000) by using revenue from the charges to fund county elections. It also makes reference to other "expansions," such as the new all-mail-ballot election system. Still, even if using the revenue from the charges to fund county elections and oversee the mail-ballot system constituted a policy change, there isn't any evidence suggesting this use resulted in a net revenue gain in violation of TABOR's limitations. Similarly, the record doesn't establish how the use of the collected revenue to fund county elections and mail ballots could constitute a new tax or a tax rate increase. The record says nothing about whether the Secretary increased charges, or created new charges, to fund the county elections and mail ballots.

¶43 Second, NFIB argues that the parties' stipulation includes examples of the Department repeatedly changing the business and licensing charges. But the Secretary is directed under section 24-21-104—a pre-TABOR statute—to change

20

the charges to approximate the Department's direct and indirect costs. As long as these adjustments didn't create a new tax, tax rate increase, or a tax policy change directly causing a net revenue gain, then the adjustments don't trigger TABOR. And, as we've noted, the record contains nothing to suggest that any adjustment meets that bar. In short, an adjustment is necessary but insufficient to show a TABOR violation.

¶44 Third, NFIB cites the resumption of charges after "fee holidays" as violating TABOR. The Secretary has authority to provide a temporary reprieve from its charges if need be—in fact, the Secretary explains that these "fee holidays" are often used to secure TABOR compliance by ensuring the government does not exceed TABOR's revenue limits. The mere existence of these fee holidays doesn't prove that the reestablishment of the (previously charged) charges resulted in a new tax, tax rate increase, or tax policy change. NFIB failed to offer any evidence establishing that reinstatement of these charges violated TABOR.

¶45 With only the stipulated facts, we cannot say that these post-TABOR adjustments violated TABOR. Because NFIB failed to establish that there was a triable issue of fact, the trial court properly granted summary judgment in the petitioners' favor.

21

## C. Taxes?

¶46 Because the business and licensing exactions authorized by section 24-21-104 are part of a statutory mechanism that predates TABOR, and because we conclude that NFIB has not demonstrated that the post-TABOR adjustments to these exactions resulted in a new tax, tax rate increase, or tax policy change resulting in net revenue gain, we do not address whether the exactions are taxes.

## III. Conclusion

¶47 We reverse the judgment of the court of appeals and remand for reinstatement of the trial court's summary judgment order and further proceedings consistent with this opinion.